**UNITED FOOD MART, INC. d/b/a Lakes Shell and United Food Mart # 2, Inc. d/b/a Turnpike Shell, Plaintiffs,**

v.

**MOTIVA ENTERPRISES, LLC, Defendant.**

No. 04–60539 CIV.

United States District Court, S.D. Florida, Miami Division.

Sept. 29, 2005.

Jason Scott Coupal, Jason S. Coupal, Los Angeles, CA, William S. Isenberg, Isenberg & Associates, Fort Lauderdale, FL, for Plaintiffs.

Carlo A. Rodriguez, Christina T. Ng, Laurie Uustal Mathews, Samuel Alberto Danon, Hunton & Williams, Miami, FL, for Defendant.

### ORDER GRANTING SUMMARY JUDGMENT FOR DEFENDANT

ALTONAGA, District Judge.

**THIS CAUSE** came before the Court on Defendant, Motiva Enterprises, LLC's ("Motiva['s]") Motion for Summary Judgment, filed on May 31, 2005 [**D.E. 58**]. The Court heard oral argument on August 12, 2005 and has considered the parties' written submissions, pertinent portions of the record, and the applicable law.

On July 12, 2004, Plaintiffs, United Food Mart, Inc. d/b/a Lakes Shell ("Lakes Shell") and United Food Mart # 2, Inc. d/b/a Turnpike Shell ("Turnpike Shell"), filed an Amended Complaint, alleging breach of contract and violation of the Florida Motor Fuel Marketing Practices Act ("FMFMPA"). Plaintiffs, who operate gasoline service stations under the "Shell" brand name, claim that Motiva, their fuel supplier, charged discriminatory prices for motor fuel under the parties' Retail Sales Agreements. Motiva now moves for sum-

mary judgment, arguing, among other things, that 1) its fuel prices fell within the range of prices charged by other refiners in the relevant geographic market and was applied uniformly to similarly-situated customers, 2) the statute of limitations bars Plaintiffs' FMFMPA claim, and 3) Plaintiffs have failed to come forward with evidence showing that their service stations were in the same "relevant geographic market" as nearby Shell stations, which Motiva allegedly favored.

## I. BACKGROUND

Lakes Shell and Turnpike Shell are Florida corporations which operate gasoline service stations (the "Lakes Station" and "Turnpike Station," respectively) in Broward County, Florida. Muhammad Rahman is the president and majority shareholder of both corporations. Motiva is a Delaware limited liability company with its principal place of business in Houston, Texas. It leases and supplies gasoline service stations under the "Shell" brand name, including the Lakes Station and Turnpike Station.

Lakes Shell originally entered into a Retail Sales Agreement and Retail Facility Lease with Motiva in December 1999, and Turnpike Shell executed similar franchise agreements in August 2001. Under the terms of their Retail Sales Agreements, Plaintiffs promised to purchase certain quantities of gasoline from Motiva and pay "the price in effect at the time loading commences at the Plant for the place of delivery." (Retail Sales Agreements [D.E. 60 Exs. 2, 4, 6] § 3(a).) The "price in effect" that Motiva charged Plaintiffs was the "dealer tank wagon" (or "DTW") price. According to Arthur Driscoll, Motiva's Retail Sales Manager for South Florida, Motiva set its DTW price according to a "zone" system:

> Motiva, like other oil companies, sets its DTW prices according to the specific dealers' competitive market or zone.

> Motiva's specific proprietary system is known as its "trade area pricing" system. Each different competitive zone is known as a "DRC" and the number of dealers in a particular zone, the shape of a zone and the number of zones in a particular area can vary. Zones can be very small; some contain only one Shell dealer.

(Driscoll Decl. 5/31/05 [D.E. 60 Ex. 1] ¶ 6.)

Under the terms of their Retail Sales Agreements, Plaintiffs were also required to maintain certain levels of quality, described as "Brand Standards":

> Brand Standards are guidelines relating to the image, operations, and appearance of the stations that franchisees are contractually required to fulfill. The purpose of these Brand Standards is to ensure that Shell maintains a consistent brand image and superior customer service throughout its network of dealers, in order to increase loyalty of current customers, attract new customers and improve business performance. Provisions requiring dealers to comply with Brand Standards are standard in all Retail Sales Agreements.

(Weir Decl. [D.E. 60 Ex. 8] ¶ 3.)

According to James Weir, Shell Oil Products U.S.A.'s Channels Manager, Motiva's sales representatives evaluate stations for compliance with Brand Standards and "uniformly apply the same objective criteria" to all of their inspections. (Id. ¶ 5.) Mr. Weir testified that "as of the first quarter of 2004, 92.4% of all Shell branded retail stations nationwide came within compliance of the Brand Standards." (Id. ¶ 9.)

Mr. Rahman testified that soon after he acquired the Lakes and Turnpike Stations, sales of gasoline, convenience store items, and carwashes increased at both stations. (Rahman Decl. [D.E. 71] ¶¶ 3–4.) By mid–2001, however, Mr. Rahman noticed that

gasoline prices at a nearby Shell-branded station (the "Broward Shell") "were far less than gas prices of surrounding businesses in the area, including Lakes and Turnpike Shell." (*Id.* ¶ 5.) A few months later, Mr. Rahman observed the Broward Shell selling gasoline "5 to 10 cents less" than his DTW prices. (*Id.* ¶ 7.)

Mr. Rahman inquired about the low prices that he observed at the Broward Shell. According to Mr. Rahman, two Motiva representatives, Jennifer Garnett and Scott Howard, told Mr. Rahman that the Broward Shell's owner had "a deal" with Motiva such that he could buy fuel at lower prices than other dealers. (*Id.* ¶¶ 6–7.) Mr. Rahman stated that Mr. Howard disclosed to him that because of this deal, "Broward Shell sales have doubled from previous years." (*Id.* ¶ 7.) According to Mr. Rahman, another Motiva representative, Norman Forster, Jr., told him that "a penny or two less on gas prices really does not make a difference." (*Id.* ¶ 6.)

In March 2002, Mr. Rahman observed another Shell-branded station (the "Lexymart Shell") begin to sell gasoline below his DTW prices. (*Id.* ¶ 8.) Mr. Rahman testified that because the Broward Shell and Lexymart Shell were selling gasoline at such low prices in the same area as the Lakes and Turnpike Stations, the overall sales at his stations "decreased by half," and he began to suffer financial losses. (*Id.*) According to Mr. Rahman, Plaintiffs' minority shareholders "walked out of the business because they did not want to put their money in the business any longer." [1] (*Id.*)

In response to continued complaints about the price of gasoline at neighboring stations, Mr. Rahman states that Motiva representatives offered to mutually terminate his franchise agreements. (*Id.* ¶ 10.) In 2003, according to Mr. Rahman, Franke Nixon prepared a mutual termination letter, which Mr. Rahman refused to sign. (*Id.* ¶ 11.) Furthermore, Mr. Rahman states that Mr. Forster twice threatened to require cash-on-delivery for Plaintiffs' fuel purchases. (*Id.* ¶ 10.) According to Mr. Rahman, at one point "he went ahead to do a COD, but later cancelled it on a condition that I would withdraw my complaints and due to my financial situation I had to comply." (*Id.*)

Mr. Rahman testified that from 2000 to 2002, the Lakes and Turnpike Stations always received passing scores on their quality inspections, but as a result of his complaints about gasoline prices, Motiva representatives started to give his stations low Brand Standards scores. (*Id.* ¶ 12–13.) According to Mr. Driscoll, Lakes Shell failed quality inspections on June 24, 2003, July 29, 2003, September 15, 2003, and October 1, 2003. (Driscoll Decl. 9/8/05 [D.E. 60 Ex. 9] ¶ 10.) Similarly, Turnpike Shell received failing quality inspection scores on June 3, 2003, June 19, 2003, June 26, 2003, July 9, 2003, and August 1, 2003. (*Id.*)

Mr. Rahman blames Motiva for his stations' failure to meet the required quality levels:

> When problems occurred with gas quality and appliances within the store, I asked Shell [personnel] for help several times without receiving any type of response.... I paid Shell $1800.00 per gas station every month for maintenance

---

1. The minority shareholders sued Lakes Shell and Turnpike Shell in Florida state court, alleging that Mr. Rahman had denied them access to the corporate records and distributed profits from the businesses without accounting to them. *See Delwar v. United Food Mart, Inc.*, No. 0415100 (Fla. 17th Jud. Cir.) (Compl. [D.E. 60 Ex. 15] ¶ 14, 24). They seek a court-ordered inspection, an accounting, and judicial dissolution of the corporations. *Id.* at 2–5.

services, which they failed to provide.... I was left helpless because Shell did not provide the maintenance services, which in turn caused me to fail these inspections.

(Rahman Decl. ¶ 27.) Mr. Rahman also states that Motiva changed its maintenance contractors several times from 2002 to 2004 and that these contractors "were incompetent." (*Id.* ¶ 28.) Finally, Mr. Rahman testified that he was unable to sell gasoline "innumerable times" because Motiva's computer systems and pumps were down, and starting in 2002, Motiva was late in delivering gasoline "numerous times" yet failed to compensate him. (*Id.*)

On November 12, 2003, Motiva sent Lakes Shell and Turnpike Shell warning letters, indicating that they had failed their most recent inspections and that continued violations of the Brand Standards would result in termination or non-renewal of their franchises. (Driscoll Decl. 9/8/04 ¶ 11.) On December 12, 2003, Motiva inspected both stations again, and once again both stations received failing scores. (*Id.* ¶ 12.) Motiva then sent Plaintiffs a second warning letter on February 27, 2004, indicating that Motiva had decided to inspect the stations again in March 2004. (*Id.* ¶ 13.) On March 9, 2004, Motiva inspected Plaintiffs' stations, and, once again, they received failing scores. (*Id.* ¶ 14.)

On April 27, 2004, Plaintiffs commenced this action, alleging that Motiva engaged in discriminatory pricing in violation of the FMFMPA and breached the Retail Sales Agreements by setting the DTW prices in bad faith. Plaintiffs claim that Motiva ran them out of business in order to take over their stations. On May 12, 2004, Motiva sent Plaintiffs written notices that their supply agreements and leases would be terminated on August 20, 2004 due to continued violations of the Brand Standards. (*Id.* ¶ 15.) On August 16, 2004, Plaintiffs moved for a preliminary injunction under

the Petroleum Marketing Practices Act, seeking to prevent termination of their franchise agreements [D.E. 22]. On October 27, 2004, the Court issued a Consent Order Denying Plaintiffs' Motion for Preliminary Injunction [D.E. 44]. The parties agreed that Plaintiffs would cease operations and vacate their respective stations by November 8, 2004.

Motiva now moves for summary judgment, arguing that it validly terminated Plaintiffs' franchise agreements for repeated violations of the Brand Standards. Motiva contends that Mr. Rahman brought this action in order to deflect criticism of his mismanagement of the businesses. According to Motiva, the undisputed facts demonstrate that its DTW prices fell within the range of prices that other refiners in the area charged and were applied uniformly through Motiva's trade area pricing system, thus entitling it to summary judgment on Plaintiffs' breach of contract claim. Motiva also maintains that it is entitled to summary judgment on Plaintiffs' FMFMPA claim based on the statute of limitations and Plaintiffs' failure to submit competent evidence concerning the "relevant geographic market."

## II. LEGAL STANDARD

Summary judgment shall be rendered "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). In making this assessment, the Court "must view all the evidence and all factual inferences reasonably drawn from the evidence in the light most favorable to the nonmoving party," *Stewart v. Happy Herman's Cheshire Bridge, Inc.,* 117 F.3d 1278, 1285 (11th Cir.1997), and "must resolve all reasonable doubts

about the facts in favor of the non-movant." *United of Omaha Life Ins. Co. v. Sun Life Ins. Co. of America,* 894 F.2d 1555, 1558 (11th Cir.1990).

"By its very terms, this standard provides that the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247–48, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986) (emphasis in original). "As to materiality, the substantive law will identify which facts are material. Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted." *Id.* at 248, 106 S.Ct. 2505. Likewise, a dispute about a material fact is a "genuine" issue "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*

The moving party "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Summary judgment is proper "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Id.* at 322, 106 S.Ct. 2548. In those cases, there is no genuine issue of material fact "since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Id.* at 323, 106 S.Ct. 2548.

## III. ANALYSIS

### A. Breach of Contract

█ The parties agree that the Retail Sales Agreements constitute contracts for the sale of goods (in this case, motor fuel) governed by the Uniform Commercial Code ("U.C.C.").[2] As such, they "impose[ ] an obligation of good faith in [their] performance or enforcement." Fla. Stat. § 671.203. The parties also agree that the DTW price is an "open price term," which the U.C.C. requires to be set in good faith. *See id.* § 672.305(2) ("A price to be fixed by the seller or by the buyer means a price for her or him to fix in good faith.").

Plaintiffs allege that Motiva breached the Retail Sales Agreements by fixing its DTW price in bad faith. Specifically, they claim that Motiva charged them a DTW price higher than it charged the Broward Shell and Lexymart Shell. For example, Mr. Rahman observed the Broward Shell selling gasoline at a retail price five to ten cents less than his DTW price. This, according to Mr. Rahman, allowed the Broward Shell to increase its sales while his businesses failed.

The U.C.C. defines "good faith" in the case of a merchant (such as Motiva)[3] to mean "honesty in fact and the observance of reasonable commercial standards of fair dealing in the trade." *Id.* § 672.103(1)(b). The U.C.C.'s Official Comments discuss

---

2. "Chapters 670–680 [of the Florida Statutes] may be cited as the 'Uniform Commercial Code.' " Fla. Stat. § 671.101.

3. " 'Merchant' means a person who deals in goods of the kind ...." Fla. Stat. § 672.104(1). As a motor fuel supplier, Motiva qualifies as a "merchant" of motor fuel for purposes of the U.C.C.

the obligation of good faith with respect to an open price term and create a presumption that in the "normal case," a seller's posted price or price in effect is also a good faith price:

> [U.C.C. § 2–305(2), codified at Fla. Stat. § 672.305(2) ], dealing with the situation where the price is to be fixed by one party rejects the uncommercial idea that an agreement that the seller may fix the price means that he may fix any price he may wish by the express qualification that the price so fixed must be fixed in good faith. Good faith includes observance of reasonable commercial standards of fair dealing in the trade if the party is a merchant. (Section 2–103 [Fla. Stat. § 672.103(1)(b) ] ). But in the normal case a "posted price" or a future seller's or buyer's "given price," "price in effect," "market price," or the like satisfies the good faith requirement.

U.C.C. § 2–305 cmt. 3; *see also Allapattah Services, Inc. v. Exxon Corp.,* 61 F.Supp.2d 1308, 1320 (S.D.Fla.1999), *aff'd,* 333 F.3d 1248 (11th Cir.2003) (quoting U.C.C. § 2–305 cmt. 3).

Motiva contends that this is a "normal case" in which it is entitled to a presumption that its posted DTW price satisfied the good faith requirement of Florida Statute § 672.305(2). Specifically. Motiva claims that its DTW price fell within the range of prices that other suppliers in the relevant geographic market charged (was commercially reasonable) and was applied uniformly among Motiva's similarly-situated dealers (was non-discriminatory). Be-

cause its DTW price was commercially reasonable and non-discriminatory, Motiva argues that it is entitled to summary judgment on Plaintiffs' U.C.C. claim.

■ "[T]he majority of decisions suggest that a commercially reasonable DTW price, that is, one within the range of DTW prices charged by other refiners in the market, is a good faith price under [U.C.C. § 2–305] absent some evidence that the refiner used pricing to discriminate among its purchasers." *Shell Oil Co. v. HRN, Inc.,* 144 S.W.3d 429, 434 (Tex.2004) (citations omitted). Accordingly, "courts have generally rendered judgment as a matter of law on similar claims under section 2–305 where the refiner used a posted price which it fairly applied to similarly-situated purchasers." *Id.* at 436 (citations omitted).

In this case, Motiva submitted the declaration of John R. Umbeck, Ph.D., an economics professor at Purdue University, to show that its DTW price was commercially reasonable. Dr. Umbeck concludes that for the years 2000 to 2004, "the DTW prices charged by Motiva to Plaintiffs' Lakes and Turnpike stations were within the range of prices charged by other refiners in the Fort Lauderdale area."[4] (Umbeck Decl. [D.E. 60 Ex. 13] at 3–4.) Plaintiffs concede that they have no evidence to rebut this conclusion.

As to the second inquiry (whether Motiva's DTW price was applied in a non-discriminatory manner), Motiva submitted the declaration of Mr. Driscoll, who ex-

---

**4.** Dr. Umbeck reached this conclusion by analyzing the DTW prices of Shell, Mobil, BP/Amoco, and Chevron in the Fort Lauderdale area from 2000 to 2004. He found that Shell's average DTW price "is typically neither the highest nor the lowest price, but rather 'in the range' among the DTW prices charged by the major brands retailers in the Fort Lauderdale area." (Umbeck Decl. at 3–4.) Dr. Umbeck also analyzed the actual DTW prices charged to the Lakes Shell and Turnpike Shell. He found that "[e]xcept for a few months in late 2002, when Shell was among the highest and a few months in 2003 and 2004, when Shell was the lowest, the charts indicate that the specific DTW prices for these stations were 'in the range' charged by other major brand retailers in the Fort Lauderdale area." (*Id.* at 4.)

plained Motiva's adoption and use of the zone area pricing system:

> Motiva developed its zone area pricing system in 1999, with the help of an independent third party consultant. Motiva determines a dealer's competitive zone through its system known as "trade area pricing." The trade area pricing system is based on a number of factors including natural boundaries, traffic flow along surface streets and highways, traffic distribution, population distribution, marketing conditions, the likely effect of existing commercial, industrial and residential developments on area customers' buying habits, and other factors which differentiate one competitive market from another.

> Motiva with the assistance of its consultant (MPSI) evaluated these factors when setting the price zones for each of the four respective Shell stations at issue in this case. Based on the trade area pricing evaluation, the Lakes, Turnpike, Lexymart and Broward Stations were not considered to be within each other's respective competitive zone. Accordingly, separate pricing zones were designated for each of these four stations.

> The pricing zones set for each of the Lakes, Turnpike, Lexymart and Broward Stations were in place when Mr. Rahman assumed ownership of the Lakes and Turnpike Stations and have remained unchanged since that time. Additionally, the manner in which Motiva set its DTW prices for each of these four stations was in place when Mr. Rahman assumed ownership of the Lakes and Turnpike Stations and has also remained unchanged since that time.

(Driscoll Decl. 5/31/05 ¶¶ 7–9.)

Plaintiffs do not dispute the substance of Mr. Driscoll's testimony;[5] rather, they have submitted the declaration Howard Marmorstein, Ph.D., a marketing professor at the University of Miami, who concludes that "both Broward Shell and Lexymart Shell were direct competitors of [Lakes Shell] and that the prices charged to [Lakes Shell] were not commercially reasonable."[6] (Marmorstein Decl. [D.E. 72] at 4.) The Court has ruled that this conclusion is based on an unreliable methodology and has therefore excluded Dr. Marmorstein's testimony. (*See* Order Striking Opinions and Testimony of Plaintiffs' Expert Witness at 13.)

Even if Dr. Marmorstein's testimony were considered, however, it only raises a genuine issue of fact regarding whether Motiva's zone area pricing system *accurately* captured all of Lake Shell's competitors, which is not material to Plaintiffs' U.C.C. claim. In this case, Mr. Driscoll states that the Lakes, Turnpike, Lexymart, and Broward stations were each assigned to a different price zone. Dr. Marmorstein, however, testified that Lakes Shell directly competes with Lexymart and Broward Shell, based on the stations' locations and consumers' buying habits. Nevertheless, whether Motiva adopted or used

---

**5.** Plaintiffs have objected, however, that Motiva failed to disclose the details of its zone area pricing system in discovery and instead brought them up for the first time in conjunction with its motion for summary judgment. The record, however, indicates that on August 3, 2004, Motiva disclosed the existence of "DRC/Price Zone maps for Plaintiffs and other Shell stations allegedly competing with Plaintiffs identified in Amended Complaint."

(Motiva Rule 26 Initial Disclosures [D.E. 19] at 2.) Plaintiffs therefore had adequate notice of a price zone system and could have requested discovery on the system at that time if they had wished to do so.

**6.** Dr. Marmorstein's opinion addresses only Lakes Shell and does not address Turnpike Shell. (Marmorstein Decl. at 2.)

a faulty or inaccurate zone pricing system is not a material issue—the relevant question is whether Motiva adopted or used a *discriminatory* pricing system. *Cf. Collins v. Miami–Dade County*, 361 F.Supp.2d 1362, 1377 (S.D.Fla.2005) ("It is not the court's role to second-guess the wisdom of an employer's decisions as long as the decisions are not motivated by improper reasons.").

It is undisputed that Motiva adopted a zone area pricing system in 1999, before Mr. Rahman acquired an ownership interest in the Lakes or Turnpike Station. The facts also show that Motiva's pricing zones for the Lakes, Turnpike, Lexymart, and Broward stations were in place when Mr. Rahman assumed ownership of his stations and have remained unchanged since that time. Finally, it is undisputed that Motiva designed its zone area pricing system with the assistance of a third-party consultant, who considered legitimate business factors such as traffic flow, population distribution, market conditions, etc.

Plaintiffs have put forth **no evidence** to suggest that Motiva developed its zone area pricing system for discriminatory reasons or that Motiva used its system in an arbitrary or capricious manner. The fact that the system may be imperfect and fail to identify all of Lakes Shell's possible competitors does not mean that Motiva exhibited bad faith in establishing the system or using it to set Plaintiffs' DTW prices. *See HRN*, 144 S.W.3d at 437 ("[G]ood faith under [U.C.C. § 2–305] does not mandate a competitive price for each individual Dealer, nor could it. The competitive circumstances of each Dealer in the same pricing zone may vary from station to station, and yet Shell must treat them all the same."). Because Motiva's DTW prices fell within the range of prices that other suppliers in the relevant geographic market charged and were applied uniformly among Motiva's dealers through

its zone area pricing system, Motiva is entitled to a presumption that its DTW prices were set in good faith, as required by Florida Statutes § 672.305(2).

Nevertheless, Plaintiffs contend that a good-faith presumption is inappropriate here because, according to them, this is not the "normal case" contemplated by the drafters of U.C.C. § 2–305. Specifically, Plaintiffs point to evidence that: 1) Motiva charged some of Lakes Shell's competitors lower DTW prices than it charged Lakes Shell; 2) Motiva offered to mutually terminate Plaintiffs' franchise agreements; 3) Mr. Forster threatened to require cash-on-delivery for Plaintiffs' fuel purchases; 4) Motiva failed to provide maintenance services, which caused Plaintiffs to fail their quality inspections; and 5) Motiva delivered fuel late on numerous occasions. Plaintiffs argue that this evidence raises genuine issues of material fact as to whether Motiva set its DTW prices in had faith with the intent to drive them out of business.

" [T]he words 'in the normal case' mean that, although a posted price will usually be satisfactory, it will not be so under all circumstances.' " *Allapattah*, 61 F.Supp.2d at 1320 (quoting *Nanakuli Paving & Rock Co. v. Shell Oil Co.*, 664 F.2d 772, 805 (9th Cir.1981)). In *Allapattah*, for example, gasoline service station owners sued Exxon Corporation, their fuel supplier, alleging that Exxon had double-charged them for credit card processing fees after it promised to reduce its wholesale fuel prices to offset those fees. *Id.* at 1313. The plaintiffs also alleged that "Exxon not only failed to do as it promised, it also breached its obligation in bad faith, by secretly dividing its dealers into 'keepers' and 'non-keepers,' while internally recognizing that its pricing practices were driving the 'non-keepers' out of business." *Id.*

Notably, the plaintiffs in *Allapattah* did "not claim that Exxon's wholesale prices were discriminatory or outside the range of prices charged by other major oil companies." *Id.* at 1322. Rather, they argued that "this case deserves special treatment because it is not a 'normal case' as contemplated by § 2–305." *Id.* at 1322. The court agreed:

> Because the parties' dispute is not over the actual amount of the price Exxon charged for its wholesale gasoline to its dealers, but rather over the manner in which the wholesale price was calculated without considering the doubled charge for credit card processing, the instant action is not the "normal" case.

*Id.* at 1322. The court concluded that "[t]he question of price then—whether it was reasonable as calculated—is a question for the jury to resolve upon the evidence." *Id.* at 1324.

This case, by contrast, *is* a dispute over the actual amount of the price Motiva charged for its wholesale gasoline to its dealers, and unlike *Allapattah*, Plaintiffs here *have claimed* that Motiva's wholesale prices were discriminatory. This is not a case where an entire class of station owners claim that their fuel supplier breached its promise to reduce wholesale prices and instead double-charged them. This is also not a case where there is evidence that the supplier divided its dealers into "keepers" and "non-keepers" and internally recognized that its pricing practices were driving the "non-keepers" out of business. Rather, this is a "normal case" where one station owner believes that his wholesale price was too high compared to the prices charged to nearby stations. In such a case—where the wholesale price was within the range of prices that other suppliers charged and was applied uniformly—the dealer is entitled to the presumption that the open price term was set in good faith. Accordingly, Motiva is entitled to summary judgment on Plaintiffs' U.C.C. claim.

## B. Florida Motor Fuel Marketing Practices Act

The Florida legislature enacted the Florida Motor Fuel Marketing Practices Act ("FMFMPA") to encourage competition in the marketing of motor fuel by prohibiting "certain marketing practices" which impair competition, "[p]redatory practices and, under certain conditions, discriminatory practices." Fla. Stat. § 526.302. Specifically, it is unlawful under the FMFMPA for any person engaged in commerce in Florida

> [t]o sell for resale any grade of motor fuel at a price lower than the price at which the seller contemporaneously sells motor fuel of like grade and quality to another person on the same level of distribution, in the same class of trade, and within the same relevant geographic market as the purchaser ... where the effect is to injure competition.

*Id.* § 526.305(1)(a). Plaintiffs contend that Motiva sold the same grade of motor fuel to other retail stations (the Broward Shell and Lexymart Shell) in the same relevant geographic market where the effect was to injure competition.

### 1. Statute of Limitations

■ The FMFMPA's statute of limitations provides that "a private action brought under s. 526.305 for unlawful price discrimination shall be brought within 2 years from the date the alleged violation occurred or should reasonably have been discovered." Fla. Stat. § 526.313. Motiva therefore moves for summary judgment, arguing that because Mr. Rahman became aware sometime between mid–2001 and March 2002 that nearby Shell stations were selling gasoline for less than his DTW prices, Plaintiffs should have brought suit, at the latest, by March 2004. Plaintiffs argue, for their part, that Motiva

engaged in a "continuing violation" of the FMFMPA.

Neither party has cited a case interpreting the continuing violation theory as it applies to the FMFMPA's statute of limitations. The parties agree, however, that cases applying the Robinson–Patman Act,[7] 15 U.S.C. § 13, and similar state price discrimination statutes, are persuasive authority in interpreting the FMFMPA. A four-year statute of limitations applies to private actions to enforce the federal antitrust laws, including the Robinson–Patman Act. 15 U.S.C. § 15b.

█ "Generally, a cause of action accrues [under the federal antitrust acts] and the statute begins to run when a defendant commits an act that injures a plaintiff's business." *Zenith Radio Corp. v. Hazeltine Research*, 401 U.S. 321, 338, 91 S.Ct. 795, 28 L.Ed.2d 77 (1971). "Antitrust law [also] provides that, in the case of a 'continuing violation,' say a price fixing conspiracy that brings about a series of unlawfully high priced sales over a period of years, each overt act that is part of the violation and that injures the plaintiff, *e.g.*, each sale to the plaintiff, starts the statutory period running again, regardless of the plaintiff's knowledge of the alleged illegality at much earlier times." *Klehr v. A.O. Smith Corp.*, 521 U.S. 179, 189, 117 S.Ct. 1984, 138 L.Ed.2d 373 (1997) (citations and internal quotation marks omitted).

Motiva argues that it engaged in one overt act: establishing a zone area pricing system in 1999, of which Plaintiffs became aware, at the latest, by March 2002. Motiva contends that by this action, it assigned Plaintiffs' stations and the Lexymart and Broward Shell stations to different price zones, which continued for the duration of Plaintiffs' Retail Sales Agreements. Therefore, according to Motiva, individual payments for gasoline purchases under the Retail Sales Agreements "do not constitute a 'new and independent act,' as required to restart the statute of limitations." *Grand Rapids Plastics, Inc. v. Lakian*, 188 F.3d 401, 406 (6th Cir.1999).

The former Fifth Circuit[8] has decided two relevant reported decisions interpreting the continuing violation doctrine as applied to federal antitrust law: *Imperial Point Colonnades Condominium, Inc. v. Mangurian*, 549 F.2d 1029, 1031 (5th Cir. 1977), and *City of El Paso v. Darbyshire Steel Co.*, 575 F.2d 521, 522 (5th Cir.1978). "In those cases the courts held that a cause of action 'accrues' where a continuing violation occurs when a party derives 'continuing benefits' from acts committed subsequent to the signing of the contract and where damage to plaintiff was incapable of precise proof at the time of the signing." *Amey, Inc. v. Gulf Abstract & Title, Inc.*, 758 F.2d 1486, 1501 (11th Cir. 1985).

In *Imperial Point Colonnades*, purchasers of condominium units were required, as a condition to condominium ownership, to accept assignment of an undivided interest in a lease of nearby recreational facilities. 549 F.2d at 1031–32. The recreational lease allowed annual rent, which was passed on to the condominium owners, to be periodically adjusted with reference

---

**7.** " 'Section 2 of the Clayton Act, known as the Robinson–Patman Act, prohibits a supplier from unfairly giving one dealer or distributor a price advantage over that dealer's or distributor's competitor.' " *Sixty Enters., Inc. v. Roman & Ciro, Inc.*, 601 So.2d 234, 237 n. 5 (Fla. 3d DCA 1992) (quoting the Staff Analysis of the House of Representatives Committee on Commerce at the time the FMFMPA was passed).

**8.** Decisions of the former Fifth Circuit issued prior to October 1, 1981 are binding as precedent in the Eleventh Circuit. *Bonner v. City of Prichard*, 661 F.2d 1206, 1207 (11th Cir. 1981) (en banc).

to the Department of Labor's Consumer Price Index. *Id.* The condominium owners sued the landowner and condominium complex developer, arguing that the requirement that they become parties to the recreational lease constituted an unlawful "tying agreement" and that the defendants had conspired in restraint of interstate commerce in violation of federal antitrust law. *Id.* at 1033.

The defendants in *Imperial Point Colonnades* pled the statute of limitations as a bar to the claim for damages, however, because the allegedly illegal leases were executed more than four years prior to the condominium owners' bringing suit. *Id.* The court disagreed and held that "so long as [the landowner] continues to collect rent from these plaintiffs under the lease, plaintiffs' causes of action for the conspiracy continue to accrue." *Id.* at 1043–44.

The court reached a different conclusion under slightly different facts in *City of El Paso.* In that case, the City of El Paso, Texas, signed a contract with a general contractor for the construction of a new civic center complex. 575 F.2d at 522. On September 20, 1970, the general contractor signed an agreement with the defendants for the supply of all steel and miscellaneous metal products to be used in the construction project. *Id.* More than four years later, the City sued the defendants, alleging that they had conspired to submit a collusive bid on the structural steel, in violation of federal antitrust laws. *Id.* at 523.

The court in *City of El Paso* found that the statute of limitations applied and barred the City's suit, notwithstanding the fact that the defendants received the benefits of the contract (payments for deliveries of steel) well within the limitations period. *Id.* The court distinguished *Imperial Point Colonnades* by stating that in that case,

the damage to the plaintiff was incapable of precise proof at the time the contract was signed because future payments under the contract (which also involved an illegal tying arrangement) were periodically adjusted with reference to the Department of Labor's consumer price index. Each collection by the defendants constituted a separate act injurious to the plaintiff and allowed a new cause of action to accrue. In the instant case, the rights and liabilities of the parties were finalized by the contract signed on September 4, 1970. On that date, the price, the quantity, and the delivery schedule were fixed by the terms of the contract. Any damages caused by the alleged conspiracy were provable with certainty on that date.

*Id.*

This case is similar to both *Imperial Point Colonnades* and *City of El Paso* in so far as Motiva derived benefits from its *allegedly illegal* pricing system within the two-year limitations period of the FMFMPA. However, unlike the situation in *City of El Paso* where the date, price, quantity, and delivery schedule of the plaintiff's purchases were fixed at the outset by a contract, here the price, quantity, and date of delivery of Plaintiffs' fuel purchases were not fixed by either the Retail Sales Agreements or by Motiva's zone area pricing system.

Instead, Motiva periodically adjusted its DTW price (which it charged to the Plaintiffs and their alleged competitors) over the life of the parties' commercial relationship. As in *Imperial Point Colonnades,* Plaintiffs' damages here were incapable of precise proof at the time the parties executed their Retail Sales Agreements or at the time that Motiva established its zone area pricing system. Accordingly, each sale of fuel by Motiva to Plaintiffs started

a new statutory limitations period under the FMFMPA.[9]

### 2. The "Relevant Geographic Market"

 To succeed in a claim under the FMFMPA, a plaintiff must show that a fuel supplier sold motor fuel at a lower price "to another person on the same level of distribution, in the same class of trade, and within the same relevant geographic market as the purchaser." Fla. Stat. § 526.305(1)(a). Plaintiffs have offered the testimony of Dr. Marmorstein to prove that the Lakes Station was in the same "relevant geographic market" as the Lexymart and Broward Shell stations. Dr. Marmorstein's conclusion, however, that both Broward Shell and Lexymart Shell were direct competitors of Lakes Shell, and therefore in the same relevant geographic market, is based on an unreliable methodology, and has been stricken. (*See* Order Striking Opinions and Testimony of Plaintiffs' Expert Witness at 13.) Accordingly, Plaintiffs have put forth no competent expert testimony regarding the element of "relevant geographic market."

"[T]o prove relevant market, expert testimony is of utmost importance, and that testimony, or any other evidence, must be based on specific facts pertaining to the proposed market." *Berlyn, Inc. v. Gazette Newspapers*, 223 F.Supp.2d 718, 727 (D.Md.2002), *aff'd*, 73 Fed.Appx. 576 (4th Cir.2003) (unpublished opinion). In this case, Plaintiffs have come forward with no competent evidence to raise a genuine issue of material fact as to whether Plaintiffs' allegedly favored competitors were in the same relevant geographic market as the Lakes and Turnpike Stations.

Accordingly, summary judgment in favor of Motiva is appropriate on Plaintiffs' FMFMPA claim.

## IV. CONCLUSION

For all the reasons set forth above, it is **ORDERED AND ADJUDGED** as follows:

1. Motiva's Motion for Summary Judgment [**D.E. 58**] is **GRANTED**.

2. The Clerk of the Court is instructed to **CLOSE** the case, and pending motions not otherwise ruled upon are **DENIED AS MOOT**.

---

9. Plaintiffs' FMFMPA claims would be limited, however, to recovery of damages for violations which occurred within the two years preceding the April 27, 2004 filing of the Complaint. *See Imperial Point Colonnades,*

549 F.2d at 1044 ("[W]e adhere to the rule that plaintiffs may sue only for damages that result from acts committed by the defendants within the four years preceding commencement of suit.").