CASSERLIE ET AL., APPELLANTS, *v.* SHELL OIL COMPANY ET AL., APPELLEES.

[Cite as *Casserlie v. Shell Oil Co.,* 121 Ohio St.3d 55, 2009-Ohio-3.]

(No. 2007–1408—Submitted May 20, 2008—Decided January 6, 2009.)

MOYER, C.J.

## I

{¶ 1} Appellants' proposition of law proposes that "[t]he definition of Good Faith under the [Uniform Commercial Code] incorporating an 'honesty in fact' component requires a subjective inquiry." We disagree and affirm the judgment of the court of appeals.

## II

{¶ 2} Appellants, Donald Casserlie and others, are a group of independent Shell lessee-dealers in the greater Cleveland area (collectively, "the dealers"). The appellees in this case are Shell Oil Company, its partners, and its successors (collectively, "Shell"), who at various times between 1995 and the time the complaint was filed sold Shell-branded gasoline to the dealers in the greater Cleveland area. The dealers leased gas stations, including equipment and land, from Shell and operated them as franchisees. The parties' contracts obligated the dealers to buy gasoline only from Shell at a wholesale price set by Shell at

the time of delivery. This type of term in a contract is known as an open-price term.

{¶ 3} The price paid by the dealers is referred to as the dealer-tank-wagon ("DTW") price because it includes the cost of delivery to the stations. Shell charged the dealers a DTW price that was based on market factors including the prices offered by its major competitor, British Petroleum ("BP"), and the street price within areas of Cleveland. In each area of the city, called a price administration district ("PAD"), Shell charged all dealers the same DTW price.

{¶ 4} In 1998, Shell, Texaco, and Saudi Aramco formed Equilon Enterprises, L.L.C.; Shell's agreements with service stations in Cleveland were assigned to Equilon. In November 1999, Equilon and appellee Lyden Company entered into a joint venture called True North Energy, L.L.C. True North became the distributor of Shell-branded gasoline in the Cleveland area, including to the stations operated by the dealers. True North set the DTW price as the wholesale price it had paid Equilon for gasoline plus six or seven cents per gallon.

{¶ 5} Shell also sold gasoline to "jobbers," which were independent companies operating non-Shell-owned gas stations. Jobbers purchased gasoline directly at the oil company's terminal and paid the "rack" price, which was the cost of purchasing gasoline at the oil company's terminal and thus did not include delivery costs.

{¶ 6} In 1999, the dealers filed suit against Shell, alleging, among other claims, that Shell had engaged in bad faith when it set the DTW price. The dealers alleged that the rack price was often substantially lower than the DTW price. This allowed jobbers, including Lyden Company, to offer wholesale DTW prices that were substantially lower than the DTW price charged to the dealers. The dealers contend that this pricing is unreasonable and is part of a marketing plan proposed by Shell that was designed to drive them out of business. The dealers assert that Shell's goal was to eliminate them so that Shell could take over operation of the gas stations, thus profiting from all of the sales, including nonfuel sales, at the stations, and not just from wholesale gasoline sales to and rental income from the dealers.

{¶ 7} The parties agreed to bifurcate the proceedings and move forward only on the bad-faith claim. On April 13, 2005, the trial court granted summary judgment for Shell. The court found that Shell did not violate R.C. 1302.18, which codifies Uniform Commercial Code ("UCC") section 2–305 and requires a price to be fixed in good faith, when it set the DTW price and that the dealers had not proven that the price had been set in a commercially unreasonable manner.

{¶ 8} The dealers appealed, arguing that bad faith may be shown either by evidence of a party's intent, a subjective standard, or by evidence of its commer-

cial unreasonableness, which is an objective standard. The court of appeals affirmed the trial court's ruling and adopted an objective standard based on *Tom–Lin Ents. v. Sunoco, Inc. (R & M)* (C.A.6, 2003), 349 F.3d 277. The court determined that the dealers failed to show that Shell's prices were not commercially reasonable. The cause is before this court upon our acceptance of a discretionary appeal.

## III

{¶ 9} As a preliminary matter, we review de novo the granting of summary judgment. *Comer v. Risko,* 106 Ohio St.3d 185, 2005-Ohio-4559, 833 N.E.2d 712, ¶ 8.

{¶ 10} The parties agree that Shell has authority pursuant to the dealer agreements to set the price of gasoline at the time of delivery. They agree that the price must be set subject to R.C. 1302.18, which requires the price to be "reasonable." R.C. 1302.18(A). Pursuant to R.C. 1302.18(B) (UCC section 2–305(2)), the price must be set "in good faith." "Good faith" is defined generally as "honesty in fact in the conduct or transaction concerned," R.C. 1301.01(S), but in the case of a merchant, " 'good faith' * * * means honesty in fact and the observance of reasonable commercial standards of fair dealing in the trade." R.C. 1302.01(A)(2). It is undisputed that Shell is a "merchant," as defined in R.C. 1302.01(A)(5).

{¶ 11} Shell argues that good faith requires an objective inquiry and is demonstrated when a seller's price is within the range of its competitors and the seller has not discriminated between similarly situated buyers. Shell also contends that "an inquiry into the seller's subjective intent is neither permitted nor required." The dealers argue that good faith requires a subjective inquiry and ask, "[H]ow can an open price, specifically calculated to drive a contractual partner out of business, be a 'good faith' price?"

{¶ 12} The trial court and court of appeals agreed with Shell, relying on *Tom–Lin Ents.,* 349 F.3d 277. In *Tom–Lin,* the court confronted an agreement nearly identical to the one between the dealers and Shell and concluded, applying Ohio law, that an inquiry into good faith required "an *objective* analysis of the merchant-seller's conduct." (Emphasis sic and footnote omitted.) Id. at 281–282. Thus, neither the trial court nor the court of appeals considered whether an examination into "good faith" required a subjective inquiry, and neither court engaged in a subjective inquiry.

{¶ 13} It is not disputed that the latter half of the definition of good faith, "the observance of reasonable commercial standards of fair dealing in the trade," requires only an objective analysis. The issue before us is whether there is room for a subjective inquiry within the honesty-in-fact analysis in these circumstances.

{¶ 14} The UCC does not define the term "honesty in fact." It should also be noted that "[c]ourts and commentators have recognized that the meaning of 'good faith' is not uniform throughout the [UCC]." *Mathis v. Exxon Corp.* (C.A.5, 2002), 302 F.3d 448, 456. See also *Martin Marietta Corp. v. New Jersey Natl. Bank* (C.A.3, 1979), 612 F.2d 745, 751 (noting that good faith is considered subjective in Article 1 but objective in Article 2). Thus, case law defining good faith in other areas of the UCC, such as the Article 1 covenant of good faith and fair dealing, is of somewhat limited value here. Non–UCC cases defining good faith are of even less relevance.

{¶ 15} Official Comment 3 to UCC section 2–305 does provide some guidance. That comment provides, in full:

{¶ 16} "[UCC section 2–305(2) ], dealing with the situation where the price is to be fixed by one party rejects the uncommercial idea that an agreement that the seller may fix the price means that he may fix any price he may wish by the express qualification that the price so fixed must be fixed in good faith. Good faith includes observance of reasonable commercial standards of fair dealing in the trade if the party is a merchant. (Section 2–103 [R.C. 1302.01] ). But in the normal case a 'posted price' or a future seller's or buyer's 'given price,' 'price in effect,' 'market price,' or the like satisfies the good faith requirement."

{¶ 17} Comment 3 explains that the purpose of R.C. 1302.18(B) is to restrict the price a seller or buyer may set when the contract price has been left open, by requiring the price to be fixed in good faith. The second sentence of the comment does not remove honesty in fact from the definition of good faith in this context, because it uses the nonexclusive term "includes." The last sentence, however, is not limited to part of the good-faith definition but rather provides a safe harbor where a "posted price" satisfies good faith in its entirety.

{¶ 18} A number of cases from other jurisdictions considering open-price terms have relied on the posted-price comment.[1] This court has noted in the past that "it is desirable to conform our interpretations of the Uniform Commercial Code to those of our sister states." *Edward A. Kemmler Mem. Found. v. 691/733 E. Dublin–Granville Rd. Co.* (1992), 62 Ohio St.3d 494, 499, 584 N.E.2d 695. Relying on the Official Comments to the UCC helps to achieve this uniformity, as does reviewing case law that has previously interpreted particular provisions.

{¶ 19} The Supreme Court of Texas addressed the very issue before us here in an essentially identical fact pattern in *Shell Oil Co. v. HRN, Inc.* (Tex.2004), 144

---

1. See *Havird Oil Co., Inc. v. Marathon Oil Co., Inc.* (C.A.4, 1998), 149 F.3d 283, 290–291; *Richard Short Oil Co., Inc. v. Texaco, Inc.* (C.A.8, 1986), 799 F.2d 415, 422; *United Food Mart, Inc. v. Motiva Ents., L.L.C.* (S.D.Fla.2005), 457 F.Supp.2d 1329, 1334–1338; *Wayman v. Amoco Oil Co.* (D.Kan.1996), 923 F.Supp. 1322, 1349; *Shell Oil Co. v. HRN, Inc.* (Tex.2004), 144 S.W.3d 429, 433–438.

S.W.3d 429. Independent gasoline dealers brought suit against Shell, alleging that the prices were not set in good faith under UCC section 2–305(2) because Shell had set the prices intending to put them out of business. 144 S.W.3d at 431–432. The court held that Shell did not violate its duty of good faith, because the posted price was both commercially reasonable and nondiscriminatory. Id. at 435–436. It noted that " '[i]t is abundantly clear * * * that the chief concern of the UCC Drafting Committee in adopting § 2–305(2) was to prevent discriminatory pricing.' " Id. at 434, quoting *Wayman,* 923 F.Supp. at 1346–1347. A subjective good-faith inquiry "injects uncertainty into the law of contracts and undermines one of the UCC's primary goals—to 'promot[e] certainty and predictability in commercial transactions.' " Id. at 435, quoting *Am. Airlines Emps. Fed. Credit Union v. Martin* (Tex.2000), 29 S.W.3d 86, 92, quoting *Putnam Rolling Ladder Co., Inc. v. Mfrs. Hanover Trust Co.* (1989), 74 N.Y.2d 340, 349, 547 N.Y.S.2d 611, 546 N.E.2d 904. The drafters of the UCC, therefore, incorporated the posted-price safe harbor to prevent extensive litigation involving any open-price term, "while seeking 'to avoid discriminatory prices.' " Id., quoting Malcolm, The Proposed Commercial Code: A Report on Developments from May 1950 through February 1951 (1951), 6 Bus.Law. 113, 186. The court concluded that subjective intent was not intended to stand alone as a basis for liability: "[A]llegations of dishonesty under this section must also have some basis in objective fact which at a minimum requires some connection to the commercial realities of the case." Id. at 435–436.

{¶ 20} A few cases note the posted-price comment but conclude that it does not provide a safe harbor where there is subjective bad faith. See *Marcoux v. Shell Oil Prods. Co. L.L.C.* (C.A.1, 2008), 524 F.3d 33, 50; *Mathis,* 302 F.3d at 455–456; *Bob's Shell, Inc. v. O'Connell Oil Assoc., Inc.* (Aug. 31, 2005), D.Mass. No. 03–30169, 2005 WL 2365324; see also *Allapattah Servs., Inc. v. Exxon Corp.* (S.D.Fla.1999), 61 F.Supp.2d 1308, 1322 (finding that when the seller double charged for credit-card processing, the action was not a "normal case," because the dispute was not over the actual price charged but over the manner in which the price was calculated; thus, the safe-harbor provision did not apply). Those cases contend that the comment is limited to the "normal case," which does not include a situation where the seller is purposefully trying to drive the buyer out of business.

{¶ 21} This interpretation would eviscerate the safe harbor in any action in which the plaintiff alleges circumstantial evidence of an improper motive, leading to drawn-out litigation "even if the prices ultimately charged were undisputedly within the range of those charged throughout the industry." *HRN,* 144 S.W.3d at 435. See Berry, Byers, & Oates, Open Price Agreements: Good Faith Pricing in the Franchise Relationship (2007), 27 Franchise L.J. 45, 49. If a subjective inquiry could determine bad faith, a seller charging a fair price, even exactly the

same price as another, good-faith seller, could be deemed to be acting in bad faith.

{¶ 22} There appear to be five other cases, besides *HRN*, that directly address the issue of subjectivity. Two, each holding in favor of a subjective inquiry, were decided under Massachusetts law. See *Marcoux*, 524 F.3d 33; *Bob's Shell*, 2005 WL 2365324. *Mathis*, 302 F.3d 448, the only other case proposing subjectivity, is no longer good law, as it was decided by the Fifth Circuit Court of Appeals under Texas law before the Texas Supreme Court issued its ruling in *HRN*. The final two cases, including one from the Sixth Circuit applying Ohio law, conclude that UCC section 2–305 requires only an objective inquiry. See *Tom–Lin Ents.*, 349 F.3d 277; *United Food Mart, Inc. v. Motiva Ents., L.L.C.* (S.D.Fla.2005), 457 F.Supp.2d 1329. There are a number of other cases discussing similar open-price-term contracts under UCC section 2–305 that conduct only an objective analysis, although those cases do not directly state that a subjective inquiry is inappropriate. See, e.g., *Schwartz v. Sun Co., Inc. (R & M)* (C.A.6, 2002), 276 F.3d 900, 905; *Mikeron, Inc. v. Exxon Co., U.S.A.* (D.Md.2003), 264 F.Supp.2d 268, 276; *T.A.M., Inc. v. Gulf Oil Corp.* (E.D.Pa.1982), 553 F.Supp. 499, 509. In total, prior to this court's opinion today, at least three jurisdictions found that the test could be met only with objective evidence of bad faith, while only one concluded that evidence of intent was sufficient.

{¶ 23} All of this is not to say that intent is necessarily irrelevant to an analysis of good faith under UCC section 2–305(2), but only that a subjective inquiry is not permitted when the posted-price safe harbor applies. By its language, the safe harbor does not apply when it is not the "normal case" or when the price setter is not imposing a "posted price," "given price," "price in effect," "market price," or the like. As long as a price is commercially reasonable, it qualifies as the "normal case." The touchstone of prices set through open-price-term contracts under UCC section 2–305 is reasonableness. A price that is nondiscriminatory among similarly situated buyers correspondingly qualifies as a "posted price" or the like. A discriminatory price could not be considered a "posted" or "market" price, because, in effect, the seller is not being "honest in fact" about the price that it is charging as a posted price, since it is charging a different price to other buyers.

{¶ 24} Therefore, a price that is both commercially reasonable and nondiscriminatory fits within the limits of the safe harbor and complies with the statute's good-faith requirement. Given our conclusion below that the safe harbor applies to the facts of this case, we are not required to precisely define good faith as it is used in UCC section 2–305(2). We offer no opinion, in particular, on the role of subjective intent within the good-faith analysis beyond the safe harbor.

## IV

{¶ 25} The facts of this case demonstrate that the prices set by Shell were both commercially reasonable and nondiscriminatory. Aside from claims that Shell's goal in setting prices was to drive the dealers out of business, the only evidence of bad faith was that the prices set were too high for dealers to remain profitable and compete with jobbers in the Cleveland area. However, Shell is not required to sell gasoline at a price that is profitable for buyers. "A good-faith price under section [2–305] is not synonymous with a fair market price or the lowest price available." *HRN*, 144 S.W.3d at 437. As noted by the court of appeals: "The trial court * * * found that Shell submitted expert testimony which established that the DTW prices set by the company were within the range set by its competitors." *Casserlie v. Shell Oil Co.*, 2007-Ohio-2633, 2007 WL 1559510, at ¶ 31. The dealers failed to rebut this evidence. Id.

{¶ 26} The dealers also point out that Shell's prices varied throughout the area because of PAD pricing. But the fact that Shell's DTW prices varied by PADs does not itself demonstrate unreasonable or discriminatory pricing. It is reasonable for Shell to adjust according to competition, and there is no evidence that Shell discriminated among similarly situated buyers, such as dealers within a given PAD or dealers in similar PADs.

{¶ 27} Finally, the only other argument of discrimination put forth by the dealers is that jobbers were charged significantly less, specifically, the rack price rather than the DTW price. Jobbers and dealers are not, however, similarly situated buyers. The price difference is partially explained by the fact that the DTW price includes a delivery charge, while the rack price does not. We further find the Sixth Circuit Court of Appeals analysis comparing jobbers and dealers in *Tom–Lin* instructive, just as the lower courts did. See *Tom–Lin Ents.*, 349 F.3d at 285–286. *Tom–Lin* noted that jobbers perform additional functions compared to dealers, such as maintaining the properties they own and bearing the risk of environmental liability. Id. at 285. Because jobbers relieve Shell of these obligations, they are charged a lower price. The dealers have not challenged these differences. The disparate pricing between jobbers and dealers is not evidence of discrimination.

## V

{¶ 28} When a price that has been left open in a contract is fixed at a price posted by a seller or buyer, and the posted price is both commercially reasonable and nondiscriminatory, the price setter has acted in good faith as required by R.C. 1302.18(B), and a subjective inquiry into the motives of the price setter is not permitted. In this case, the dealers have not provided any evidence that the prices set by Shell were commercially unreasonable or discriminatory. The

posted-price safe harbor therefore applies, and we affirm the judgment of the court of appeals.

Judgment affirmed.

LUNDBERG STRATTON, O'CONNOR, O'DONNELL, and CUPP, JJ., concur.

LANZINGER, J., concurs in judgment only.

PFEIFER, J., dissents.

---

**PFEIFER, J., dissenting.**

{¶ 29} The majority opinion's reliance on the safe-harbor presumption is misplaced, as shown by one simple fact: Official Comment 3 to Uniform Commercial Code ("UCC") section 2–305, which introduced the concept of a safe-harbor presumption, has never been adopted by the General Assembly. See Am.S.B. No. 5, 129 Ohio Laws 13, 28. The safe-harbor presumption is not part of the law of Ohio, despite the majority opinion's insouciant belief to the contrary.

{¶ 30} "Good faith" is generally treated as incorporating both subjective and objective standards. Although R.C. 1302.18 deals exclusively with open-price terms, it does not define "good faith" differently from its customary meaning. Many different jurisdictions in many different contexts, including in the context of an open-price term, define "good faith" as requiring both subjective and objective analysis. I am more persuaded by the bulk of these cases than by the fact that three out of four jurisdictions (one of which, in my view, mistakenly applied Ohio law) have decided that an open-price term is susceptible only of objective analysis. See *Bhatia v. Debek* (2008), 287 Conn. 397, 412, 948 A.2d 1009, quoting *Kendzierski v. Goodson* (1990), 21 Conn.App. 424, 429–430, 574 A.2d 249 ("In common usage, the term good faith has a well defined and generally understood meaning, being ordinarily used to describe that state of mind denoting honesty of purpose, freedom from intention to defraud, and, generally speaking, means being faithful to one's duty or obligation. * * * Whether good faith exists is a question of fact to be determined from all the circumstances"); *Tonka Tours, Inc. v. Chadima* (Minn.1985), 372 N.W.2d 723, 728 (determining good faith "necessarily involves factual findings. * * * It is for the trier of fact to evaluate the credibility of a claim of 'honesty in fact' and, in doing so, to take account of the reasonableness or unreasonableness of the claim"); *Smalygo v. Green* (Okla.2008), 184 P.3d 554, 559 ("By requiring good faith, the Legislature did not create an ambiguity nor did it render the provision vague. Rather, it employed a well-known legal concept that applies to a variety of situations and transactions. For example, the Uniform Commercial Code defines 'good faith' as 'honesty in fact and the observance of reasonable commercial standards of fair

dealing.' * * * Similarly, the concept of subjective honesty combined with objective reasonableness is found in an insurer's 'implied-in-law duty to act in good faith and deal fairly with the insured to ensure that the policy benefits are received.' *Christian v. Am. Home Assurance Co.*, 1977 OK 141, ¶ 8, 577 P.2d 899, 901"); *Simmons v. Jenkins* (1988), 230 Mont. 429, 435, 750 P.2d 1067 ("the *breach* of a duty of good faith is a question of fact not susceptible to summary judgment" [emphasis sic] ); *Miller Brewing Co. v. Ed Roleson, Jr., Inc.* (2006), 365 Ark. 38, 45, 223 S.W.3d 806 (in determining whether the Miller Brewing Company violated the Arkansas Franchise Practices Act, Ark.Code Ann. 4–72–201 et seq., the Supreme Court of Arkansas stated that "[w]hether Miller dealt with the franchise in a commercially reasonable manner and in good faith is a fact question for the jury"); *Garrett v. BankWest, Inc.* (S.D.1990), 459 N.W.2d 833, 841 ("Good faith is derived from the transaction and conduct of the parties. Its meaning varies with the context and emphasizes faithfulness to an agreed common purpose and consistency with the justified expectations of the other party"); and *Brunswick Hills Racquet Club, Inc. v. Route 18 Shopping Ctr. Assoc.* (2005), 182 N.J. 210, 224–225, 864 A.2d 387, quoting 4 Williston on Contracts (3d Ed.1961), Section 610B ("The covenant of good faith and fair dealing calls for parties to a contract to refrain from doing 'anything which will have the effect of destroying or injuring the right of the other party to receive' the benefits of the contract").

{¶ 31} The majority opinion dismisses these cases as being of "limited value" because they do not specifically address open-price terms. But "good faith" does not have a different meaning in Ohio, which has not adopted the UCC comments, when used with open-price terms than when used in any other context. Although the cases mentioned above discussed "good faith" in a variety of contexts, the courts agree that it is not possible to determine whether a party acted in "good faith" without a subjective inquiry. See *Allapattah Servs., Inc. v. Exxon Corp.* (S.D.Fla.1999), 61 F.Supp.2d 1308, 1322, fn. 24 (the UCC "imposes a duty on merchants to meet good faith requirements that are measured both subjectively and objectively").

{¶ 32} We have had little occasion to discuss "good faith" in Ohio other than to parrot the Revised Code. See *Master Chem. Corp. v. Inkrott* (1990), 55 Ohio St.3d 23, 28, 563 N.E.2d 26 (" 'Good faith' is defined in UCC 1–201(19), R.C. 1301.01(S), as 'honesty in fact in the conduct or transaction concerned' "); *Arcanum Natl. Bank v. Hessler* (1982), 69 Ohio St.2d 549, 554, 23 O.O.3d 468, 433 N.E.2d 204 (same). But we have defined "bad faith" as " 'that which imports a dishonest purpose and implies wrongdoing or some motive of self-interest.' " *Master Chem.*, 55 Ohio St.3d at 28, 563 N.E.2d 26, quoting *Smith v. Halverson* (S.D.1978), 273 N.W.2d 146, 151 (Wollman, C.J., dissenting). See Black's Law Dictionary (8th Ed.2004) 713 ("good faith" is defined as the "absence of intent to

64

defraud or to seek unconscionable advantage"). *Tom–Lin Ents., Inc. v. Sunoco, Inc. (R & M)* (C.A.6, 2003), 349 F.3d 277, on which the majority opinion relies, clearly misinterpreted *Master Chem.* in concluding that "good faith" requires only objective inquiry. The definition of "bad faith" in *Master Chem.* is the closest that opinion came to addressing the issue before us, and it does not support the conclusion reached by the court in *Tom–Lin* or the conclusion reached by the majority in this case. *Master Chem.*, 55 Ohio St.3d at 28, 563 N.E.2d 26.

{¶ 33} Although Shell cited several cases from federal courts to support its contention that prices set pursuant to an open-price term are subject to only objective inquiry, none of them are persuasive. *Ajir v. Exxon Corp.* (May 26, 1999), C.A. 9 Nos. 97–17032 and 97–17134, 185 F.3d 865, 1999 WL 393666, did not address "good faith" but only whether the price charged was "commercially reasonable." Id. at *7. *Schwartz v. Sun Co., Inc.* (C.A.6, 2002), 276 F.3d 900, 905, does not support Shell's contention, because the court addressed only the commercially reasonable aspect of good faith. *USX Corp. v. Internatl. Minerals & Chems. Corp.* (Feb.8, 1989), N.D.Ill. No. 86 C 2254, 1989 WL 10851, *1, does not support Shell's contention, because the court emphasized only that the obligation to fix a price in good faith does not "impose a requirement for a seller to match the lowest price available," an issue that is not before us. *Adams v. G.J. Creel Sons, Inc.* (1995), 320 S.C. 274, 279, 465 S.E.2d 84, does not support Shell's contention, because the court stated only that the plaintiff did not produce evidence that the price fixed by the defendant was unreasonable. *Richard Short Oil Co., Inc. v. Texaco, Inc.* (C.A.8, 1986), 799 F.2d 415, 422–423, also does not speak directly to subjective or objective inquiry; the court concluded that Short had not presented sufficient evidence to support a claim that Texaco did not act in good faith when it set a cap on rebates, in part because Short did not show that Texaco was dishonest or had a bad motive to injure Short. *Wayman v. Amoco Oil Co.* (D.Kan.1996), 923 F.Supp. 1322, 1349, does not support Shell's contention. In *Wayman,* the court concluded that the plaintiffs could not establish that Amoco had set its price in bad faith. That court stated, however, that "[i]f there was evidence that Amoco had, for example, engaged in discriminatory pricing or tried to run plaintiffs out of business, then the court's decision might be different." *T.A.M., Inc. v. Gulf Oil Corp.* (E.D.Pa.1982), 553 F.Supp. 499, 509, does not support Shell's contention. The court stated, with respect to good faith, that "[t]he plaintiffs have not alleged that the prices they were asked to pay differed from those demanded of other Gulf dealers." In short, none of these cases provide a reason to conclude that the analysis of whether a defendant acted in good faith in setting a price under an open-price term is amenable only to objective inquiry.

{¶ 34} The majority opinion also relies on *Shell Oil Co. v. HRN, Inc.* (Tex. 2004), 144 S.W.3d 429, in which the Supreme Court of Texas considered the issue that is before us and concluded that open-price terms are subject only to objective inquiry. Because the court in *HRN* relied on the readily distinguishable federal cases discussed above and on the safe-harbor presumption, which Ohio has not adopted, this court should not rely on *HRN*. See *Bob's Shell, Inc. v. O'Connell Oil Assoc., Inc.* (Aug. 31, 2005), D.Mass. No. 03–30169, 2005 WL 2365324 (the court rejected the logic and conclusion of *HRN* and stated that it agreed "with Plaintiffs' assertion that [UCC] section 2–305's purpose of preventing price discrimination should bar a supplier from trying to drive its dealers out of business").

{¶ 35} "Good faith" in the context of open-price terms should be subject to both objective and subjective inquiry. Even courts and commentators who have written in favor of the safe-harbor presumption have concluded that an intent to drive a contractual partner out of business might overcome the presumption. *Wayman*, 923 F.Supp. at 1349; Berry, Byers, and Oates, Open Price Agreements: Good Faith Pricing in the Franchise Relationship (2007), 27 Franchise L.J. 45, 51. See *Wilson v. Amerada Hess Corp.* (2001), 168 N.J. 236, 247, 773 A.2d 1121 ("various courts have stated that a party must exercise discretion reasonably *and with proper motive* when that party is vested with the exercise of discretion under a contract" [emphasis added]). I can conceive of situations in which nondiscriminatory pricing could violate "good faith." For instance, in this case, it is alleged that Shell charged all of its similarly situated franchisees the same price, and it is alleged that that price was set too high for them to profitably operate a gas station. In that situation, even though the pricing was nondiscriminatory, it was designed to drive a contractual partner out of business. So much for the concept of a partnership.

{¶ 36} I believe that "good faith" as defined in R.C. 1302.01 requires parties to act both honestly in fact and according to reasonable commercial standards. A court's analysis of a merchant's good faith, then, should be both subjective and objective. Furthermore, the safe-harbor presumption, even though not part of the law of Ohio, only applies in the normal case; at a minimum, the appellants should be allowed to attempt to establish that this is not a normal case. I would reverse the judgment of the court of appeals and remand the cause for further consideration consistent with this opinion. After this opinion becomes public, all franchisees in Ohio should watch their wallets very carefully because their franchisors will no longer be held to subjective good-faith standards. Instead, the law of the ocean applies: the big fish are free to consume smaller fish at will. Apparently, not until the waters are exclusively inhabited by a few great white sharks will the majority decide they need a bigger boat or a more robust interpretation of the UCC.

Robert E. Sweeney Co., L.P.A., Bernard Goldfarb, and Sean S. Kelly; and O'Quinn Law Firm and Anthony E. Farah, for appellants.

Baker & Hostetler, L.L.P., Thomas R. Lucchesi, and Lora M. Reece; and Baker Botts, L.L.P., Thomas R. Phillips, and David M. Rodi, for appellees.