SHELL OIL COMPANY, Motiva Enterprises LLC, Equilon Enterprises LLC, and Equiva Services LLC, Petitioners,

v.

HRN, INC., et al., Respondents.

No. 03–0555.

Supreme Court of Texas.

Argued Feb. 4, 2004.

Decided Aug. 27, 2004.

J. Michael Baldwin, J. Gregory Copeland, Macey Reasoner Stokes, Richard A. Brooks, David M. Rodi, Baker Botts, L.L.P., Ann Spiegel, Shell Oil Co., Houston, for petitioners.

George M. Fleming, Sylvia Davidow, Anita F. Kawaja, Fleming & Associates, L.L.P., Michael O'Brien, Mike O'Brien, P.C., Robert L. Steinberg, Law Office of Robert L. Steinberg, Houston, Paul B. Rosen, Law Office of Paul B. Rosen, Bellaire, Ronald J. Mann, Austin, for respondent.

Roger Townsend, Alexander Dubose Jones & Townsend LLP, Houston, for Amicus Curiae Exxon Mobil Corporation.

Richard A. Schwartz, Schwartz Junell Campbell & Oathout, L.L.P., Houston, and Richard C. Godfrey, Kirkland & Ellis LLP, Chicago, IL, for Amicus Curiae BP Products North America Inc.

Chief Justice PHILLIPS delivered the opinion of the Court.

In this case, we must decide whether the price fixed by a refiner for the sale of its gasoline under an open-price-term contract with its dealers was in good faith as required by section 2.305(b) of the Texas Business and Commerce Code. The dealers claim that the refiner's pricing practices are forcing them out of business and therefore are not in good faith. The trial court concluded that the refiner had established its good faith as a matter of law, but the court of appeals reversed the summary judgment, concluding that circumstantial evidence raised a fact issue about the refiner's good faith. *HRN, Inc. v. Shell Oil Co.,* 102 S.W.3d 205 (Tex.App.-Houston [14th Dist.] 2003). Although the refiner's

price was commercially reasonable when compared to the prices of other refiners in the relevant market, the court found some evidence in the record to suggest that the refiner's price might have been influenced by improper subjective motives such as the desire to force some of its dealers out of business. Because we conclude that the refiner established as a matter of law that its price was fixed in good faith as defined in the Code, we reverse the judgment of the court of appeals and render judgment that plaintiffs take nothing.

I

Plaintiffs are several hundred lessee dealers in seventeen different states who lease service stations and buy gasoline from Shell, operating those stations as independent businesses.[1] Each dealer and Shell enter into two agreements: a Lease and a Dealer Agreement. Shell's relationship with its lessee dealers is also governed by the federal Petroleum Marketing Practices Act ("PMPA"), which regulates the grounds for termination and nonrenewal of petroleum franchise relationships. 15 U.S.C. §§ 2801–2806.

In the Dealer Agreement, each dealer agrees to buy Shell-branded gasoline from Shell at the "dealer prices ... in effect" at the time of purchase. Shell's price to its dealers is referred to as the DTW ("dealer tank wagon") price because it includes delivery to the dealer's station by a Shell tanker truck. The DTW pricing provision is an "open price term" governed by section 2.305(b) of the Texas Business and Commerce Code (which corresponds to section 2–305(2) of the Uniform Commercial Code). Open-price-term contracts are commonly used in the gasoline refining and marketing industry due to price volatility.

Shell markets gasoline to the public through a retail network that includes not only lessee dealers, but open dealers and company-operated stations as well. First, Shell acts as a franchisor, leasing service stations to franchisees such as the Dealers here that sell Shell-branded gasoline. Second, Shell sells Shell-branded gasoline directly to the public through company-operated stations. Finally, Shell sells branded and unbranded gasoline to jobbers. Some jobbers are wholesale distributors, selling Shell-branded and unbranded gasoline to stations operated by independent business owners. Other jobbers are also independent retail dealers, selling Shell-branded and unbranded gasoline directly to the public.

Jobbers operate fleets of trucks to pick up gasoline at refiners' terminals and distribute it to their own stations or to independent ones. Jobbers may have distribution agreements with several refiners simultaneously. Jobbers pay a "rack" price that is available for gasoline bought and picked up at Shell's terminals. The DTW price is typically higher than the rack price, although Shell does not set either price in relation to the other.

Shell's agreements with the Dealers prohibit them from selling any gasoline except Shell-branded gasoline. Although the contracts with the Dealers do not require them to buy Shell gasoline exclusively from Shell itself, agreements between Shell and its jobbers effectively eliminate the only major alternative source for Shell-branded gasoline. When a jobber sells gasoline to a Dealer, the jobber is retroactively charged the DTW price for that

---

1. For management and discovery purposes the trial court agreed to limit the initial trial to Houston Dealers only.

product, not the lower rack price it otherwise would pay.

The Dealers claim that Shell's pricing practices are forcing them out of business. Although Shell has the right under the Dealer Agreement to fix the DTW price at which the Dealers must buy its gasoline, all parties agree that it must exercise this right in good faith. *See* Tex. Bus. & Com. Code § 2.305(b). Dealers claim that Shell's DTW prices cannot be set in good faith because they are so high that they put Dealers at a competitive disadvantage. Dealers further assert that Shell's DTW pricing is part of a plan to replace them with company-operated outlets which are more profitable for Shell.

Shell moved for summary judgment on Dealers' good-faith pricing claims, contending that it was entitled to judgment as a matter of law because it charged a posted price applied uniformly to all Dealers and was a commercially reasonable price as well. Rather than contest the commercial reasonableness of Shell's DTW prices, Dealers argued that fact issues existed as to whether Shell had acted in bad faith by setting its DTW price with the subjectively improper motive of running Dealers out of business.

The trial court granted Shell's motion for summary judgment. The court of appeals reversed and remanded the case for trial, concluding that the Dealers had raised fact issues about Shell's subjective good faith when setting its DTW price. 102 S.W.3d 205.

## II

Most contracts for the sale of goods specify a price, but some do not because either the parties fail to consider the issue directly or purposefully leave it for later determination. When a contract for the sale of goods does not specify a price, section 2.305 of the Uniform Commercial Code[2] supplies default rules for determining whether a contract exists and what the price should be. This section is one of a series of provisions in Article 2 of the Code that fill common "gaps" in commercial contracts.

In this instance, the Code imposes on Shell the obligation of good faith when fixing its DTW price under the Dealer Agreement, providing that "[a] price to be fixed by the seller or by the buyer means a price for him to fix in good faith." Tex. Bus. & Com.Code § 2.305(b). Good faith is defined elsewhere in the Code to mean "honesty in fact and the observance of reasonable commercial standards of fair

2. That section of the UCC, dealing with open-price-term contracts, is codified as section 2.305 of Texas Business and Commerce Code and provides:

> (a) The parties if they so intend can conclude a contract for sale even though the price is not settled. In such a case the price is a reasonable price at the time for delivery if
> (1) nothing is said as to price; or
> (2) the price is left to be agreed by the parties and they fail to agree; or
> (3) the price is to be fixed in terms of some agreed market or other standard as set or recorded by a third person or agency and it is not so set or recorded.

> (b) A price to be fixed by the seller or by the buyer means a price for him to fix in good faith.
> (c) When a price left to be fixed otherwise than by agreement of the parties fails to be fixed through fault of one party the other may at his option treat the contract as cancelled or himself fix a reasonable price.
> (d) Where, however, the parties intend not to be bound unless the price be fixed or agreed and it is not fixed or agreed there is no contract. In such a case the buyer must return any goods already received or if unable so to do must pay their reasonable value at the time of delivery and the seller must return any portion of the price paid on account.

dealing." *Id.* § 1.201(b)(20).[3] Official Comment 3 to section 2.305(b) further elaborates on the good faith requirement, creating a presumption in the normal case that a seller's posted price or price in effect is also a good faith price:

> 3. Subsection [b], dealing with the situation where the price is to be fixed by one party rejects the uncommercial idea that an agreement that the seller may fix the price means that he may fix any price he may wish by the express qualification that the price so fixed must be fixed in good faith. Good faith includes observance of reasonable commercial standards of fair dealing in the trade if the party is a merchant. (Section 2–103). *But in the normal case a "posted price" or a future seller's or buyer's "given price," "price in effect," "market price," or the like satisfies the good faith requirement.*

Tex. Bus. & Com.Code § 2.305 cmt. 3 (emphasis added). Despite this definition and comment, or perhaps because of them, Shell and the Dealers urge conflicting ideas about what good faith should mean in this case.

Shell argues that a good faith price, as section 2.305(b) requires, is one that is commercially reasonable and non-discriminatory. Because its DTW price fell within the range of DTW prices charged by other refiners in the relevant geographic markets (was commercially reasonable) and was applied uniformly among similarly-situated dealers (was non-discriminatory), Shell submits that summary judgment was appropriate. According to Shell, the chief concern of the drafters in adopting section 2.305(b) was to prevent suppliers from charging two buyers with identical pricing provisions different prices for arbitrary or discriminatory reasons. The drafters, however, also wished to minimize judicial intrusion into the setting of prices under open-price-term contracts. To balance these concerns, the drafters created a presumption under Official Comment 3 that a "posted price" or "price in effect" is a good faith price that may be rebutted only by evidence of discrimination. Shell asserts that because the Dealers brought forth no such evidence here, this is a normal case where the posted price or a price in effect is a good faith price under section 2.305.

The Dealers respond that Shell's concept of good faith and the "normal case" under section 2.305 is too narrow. They reject the notion that discriminatory pricing is the only way to rebut Comment 3's posted price presumption. Instead, the Dealers submit that the definition of good faith incorporates two elements: a subjective element, "honesty in fact," and an objective element, "the observance of reasonable commercial standards of fair dealing." *See* Tex. Bus. & Com.Code § 1.201(b)(20). They conclude that both elements must be satisfied before a case is considered normal and before the posted price presumption can apply.

### III

The Dealers rely extensively on the Fifth Circuit Court of Appeals' recent decision in *Mathis v. Exxon Corp.*, 302 F.3d 448 (5th Cir. 2002), which also involved open-price contracts between an oil refiner and its dealer/franchisees. Those dealers similarly complained that the refiner had breached its duty of good faith by purposefully setting its dealer price for gasoline at uncompetitively high levels to run them

---

3. This definition was formerly limited to merchants, like Shell, but recent amendments to the Code have "brought the Article 2 merchant concept of good faith (subjective honesty and objective commercial reasonableness) into other Articles." *See* Tex. Bus. & Com. Code § 1.201(b)(20) cmt. 20.

out of business. The *Mathis* court identified the central issue to be whether good faith required observance of both subjective and objective good faith in light of the apparent "safe harbor" described in Official Comment 3. *Id.* at 454–55. The refiner contended that a price fixed according to an established price schedule was within the safe harbor described in Comment 3. The court reasoned, however, that this safe harbor was not absolute because it applied only to "normal cases," or those cases in which an open price term was set with subjective good faith. Thus, the court placed the following limitation on Comment 3's safe harbor:

> [Comment 3] avoids challenges to prices set according to an open price term unless that challenge is outside the normal type of case. Although price discrimination was the type of aberrant case on the minds of the drafters, price discrimination is merely a subset of what constitutes such an aberrant case. Any lack of subjective, honesty-in-fact good faith is abnormal; price discrimination is only the most obvious way a price-setter acts in bad faith B by treating similarly-situated buyers differently.

*Id.* at 457. In support of its interpretation, the court cited *Nanakuli Paving & Rock Co. v. Shell Oil Co.*, 664 F.2d 772, 806 (9th Cir.1981), and *Allapattah Serv., Inc. v. Exxon Corp.*, 61 F.Supp.2d 1308, 1322 (S.D.Fla.1999), *aff'd*, 333 F.3d 1248 (11th Cir.2003).

The court of appeals in this case adopted the reasoning in *Mathis*, concluding that good faith under section 2.305 encompasses both subjective and objective elements. 102 S.W.3d at 214. Although a commercially reasonable price might establish the oil company's objective good faith, it would not alone be sufficient if there were also evidence that the company's price might have been influenced by its desire to re-place franchisees with more profitable company-owned stores (a lack of subjective good faith). *Id.* at 214–15. Because the court concluded that the Dealers had presented sufficient circumstantial evidence on Shell's subjective intent to drive them out of business, it reversed the summary judgment. *Id.* at 215.

## IV

Most courts have rejected the approach of the Fifth Circuit and the court below in interpreting the good faith requirement of section 2.305. Instead, the majority of decisions suggest that a commercially reasonable DTW price, that is, one within the range of DTW prices charged by other refiners in the market, is a good faith price under section 2.305 absent some evidence that the refiner used pricing to discriminate among its purchasers. *See, e.g., Tom–Lin Enters., Inc. v. Sunoco, Inc.*, 349 F.3d 277, 281–83 (6th Cir.2003); *Havird Oil Co. v. Marathon Oil Co.*, 149 F.3d 283, 290–91 (4th Cir.1998); *Richard Short Oil Co. v. Texaco, Inc.*, 799 F.2d 415, 422 (8th Cir.1986); *Wayman v. Amoco Oil Co.*, 923 F.Supp. 1322, 1332 (D.Kan.1996) *aff'd mem.*, 145 F.3d 1347 (10th Cir.1998); *T.A.M., Inc. v. Gulf Oil Corp.*, 553 F.Supp. 499, 509 (E.D.Pa.1982); *Adams v. G.J. Creel & Sons, Inc.*, 320 S.C. 274, 465 S.E.2d 84, 86 (S.C.1995). *But see Wilson v. Amerada Hess Corp.*, 168 N.J. 236, 773 A.2d 1121 (2001); *E.S. Bills, Inc. v. Tzucanow*, 38 Cal.3d 824, 215 Cal.Rptr. 278, 700 P.2d 1280 (1985). As the court in *Wayman* observed, "[i]t is abundantly clear ... that the chief concern of the UCC Drafting Committee in adopting § 2–305(2) was to prevent discriminatory pricing—i.e., to prevent suppliers from charging two buyers with identical pricing provisions in their respective contracts different prices for arbitrary or discriminatory reasons." *Wayman*, 923 F.Supp. at 1346–47.

The Dealers themselves concede that Shell is not obligated to price its gasoline with their interests in mind or to protect them from competition. They further explain that their theory in this case does not turn on the DTW price set by Shell but rather on the reason why Shell chose to charge that price. Likewise, the court of appeals concludes that this is not the normal case because the price, although commercially in line with that charged by other refiners to their lessee dealers, may have been motivated by an improper underlying purpose to eliminate some dealerships.

■ It is not apparent, however, why the intent behind a commercially reasonable, non-discriminatory price should matter for purposes of a breach of contract claim under section 2.305(b). Dealers do not contend that they are entitled to any particular price and do not disagree that Shell's DTW price is within the range charged by other refiners to their dealers. Thus, if these Dealers were charged the same DTW price by another refiner who did not have a similar plan to thin their ranks, presumably the price would pass muster under the Dealers' view of section 2.305. Premising a breach of contract claim solely on assumed subjective motives injects uncertainty into the law of contracts and undermines one of the UCC's primary goals—to "promot[e] certainty and predictability in commercial transactions." *Am. Airlines Employees Fed. Credit Union v. Martin*, 29 S.W.3d 86, 92 (Tex.2000).

■ Beyond prohibiting discriminatory pricing, the drafters wished to minimize judicial intrusion into the setting of prices under open-price-term contracts. They understood that requiring sellers in open-price industries, such as the oil and gas industry, to justify the reasonableness their prices in order to satisfy section 2.305 would "mean[ ] that in every case the seller is going to be in a lawsuit" and that every sales contract would become "a public utility rate case." Walter D. Malcolm, *The Proposed Commercial Code: A Report on Developments from May 1950 through February 1951*, 6 Bus. Law. 113, 186 (1951). The drafters reasonably foresaw that almost any price could be attacked unless it benefitted from a strong presumption. Thus, they adopted a safe harbor, Comment 3's posted price presumption, to preserve the practice of using "sellers' standard prices" while seeking "to avoid discriminatory prices." *Id.; see also* Tex. Bus. & Comm.Code § 2.305 cmt. 3.

■ The reasoning in *Mathis* and the court of appeals in this case negates the effect of Comment 3's "safe harbor" by concluding that circumstantial evidence of "[a]ny lack of subjective, honesty-in-fact good faith" is sufficient to create an "abnormal" case in which the posted-price presumption no longer applies. *See Mathis*, 302 F.3d at 457. The effect is to allow a jury to determine in every section 2.305(b) case whether there was any "improper motive animating the price-setter," even if the prices ultimately charged were undisputedly within the range of those charged throughout the industry. *Id.* at 454. This result appears to conflict with the drafters' desire to eliminate litigation over prices that are nondiscriminatory and set in accordance with industry standards. Although the subjective element of good faith may have a place elsewhere in the Code, *see, e.g., La Sara Grain Co. v. First Nat'l Bank*, 673 S.W.2d 558, 562–63 (Tex. 1984) (applying subjective good faith to a negotiable instrument), we do not believe this subjective element was intended to stand alone as a basis for a claim of bad faith under section 2.305. Rather we conclude that allegations of dishonesty under this section must also have some basis in

objective fact which at a minimum requires some connection to the commercial realities of the case. *See* 2 James J. White & Robert S. Summers, Uniform Commercial Code § 17.6 at 167 (4th ed.1995) (noting that "the subjective rule never prevailed in Article 2 with respect to merchants" and that in "various other articles of the Code there has been a movement from subjective to objective definitions of good faith").

The two cases relied on by *Mathis* appear to make a similar connection. In *Nanakuli*, a buyer of asphalt under an open-price-term contract asserted that the seller had breached its section 2.305 duty of good faith by failing to follow industry custom when changing its price. 664 F.2d at 778. The buyer established that by trade custom and usage the sellers of asphalt on the island of Oahu, Hawaii price protected their buyers by providing notice of price increases and an opportunity for the buyer to complete projects bid under the old price. The seller, however, abandoned this practice, raising the price without notice. The buyer complained that the price increase was not in good faith because the seller had not observed "reasonable commercial standards of fair dealing in the trade." *Nanakuli*, 664 F.2d at 805. Disregarding the posted-price presumption, the court concluded that this was not a normal case because the dispute was "not over the amount of the increase B that is, the price that the seller fixed B but over the manner in which that increase was put into effect." *Id.* The price increase failed to conform to commercially reasonable standards both in "the timing of the announcement and [the seller's] refusal to protect work already bid at the old price." *Id.* at 806.

In *Allapattah*, another case involving a refiner and its dealer network, the dispute concerned the calculation of a discount that was to be applied to the refiner's posted price. *Allapattah*, 61 F.Supp.2d at 1312–13. The refiner implemented a discount for cash program to offset the costs of credit card processing which the dealers alleged resulted in their being charged twice for the cost of credit. The court concluded that these allegations were not the normal case contemplated under section 2.305 if there was evidence that the refiner double charged to recover its costs of credit while representing to its buyers that its price was net of credit costs. *Id.* at 1322. The posted-price presumption did not apply, according to the court, because the dispute was not about price but rather the "manner in which the wholesale price was calculated without considering the doubled charge for credit card processing." *Id.*

Both of these cases recognize that a price, commercially reasonable on its face, may nevertheless be applied in a dishonest fashion. But in both of these cases, the allegation of bad faith resulted in a commercial injury distinct from the price increase itself. Here the Dealers' claim of bad faith appears to be inextricably tied to the amount of the price set by Shell. We agree with those decisions that have upheld the posted price presumption against similar attacks. Applying that presumption, these courts have generally rendered judgment as a matter of law on similar claims under section 2–305 where the refiner used a posted price which it fairly applied to similarly-situated purchasers. *See, e.g., Tom–Lin Enters., Inc.*, 349 F.3d at 281–83; *Havird Oil Co.*, 149 F.3d at 290–91; *Richard Short Oil Co.*, 799 F.2d at 422; *Wayman*, 923 F.Supp. at 1332; *T.A.M., Inc.*, 553 F.Supp. at 509 (E.D.Pa. 1982); *Adams*, 465 S.E.2d at 86.

V

The Dealers maintain, however, that even though Shell used a posted price

it nevertheless violated its duty of good faith by setting its DTW price too high with the conscious intention of driving some of its franchisees out of business. And the court of appeals agreed that there was enough circumstantial evidence to raise a fact issue about Shell's subjective motives and therefore its good faith. According to the court, this evidence generally included: (1) the DTW price itself, which was on the high end of the wholesale pricing spectrum, (2) the "captive" nature of relationship between Shell and its franchisees, and (3) the general decline in the business fortunes of Shell franchisees. 102 S.W.3d at 214–15.

Shell argues that these circumstantial factors are either irrelevant, unrelated to Shell's pricing, or unsupported by the record. Shell submits that there is no evidence that its DTW price caused any particular Dealer to fail or be uncompetitive in the market. And even if there were evidence of this, Shell submits it would not raise a fact issue about its good faith because section 2.305 does not require a competitive price or the lowest price available. Moreover, Shell argues that the fact that some franchisees have experienced declining sales, lost money, or gone out of business does not raise a fact issue about whether Shell had a bad-faith plan to price them out of business. Instead, Shell suggests that market forces beyond its control are at the root of these problems. Shell points out that the Dealers' own expert agreed that the lessee dealer is "a class of trade whose economic viability is dying" due to broader market forces, including the entry of mass merchandisers into gasoline retailing.

We agree with Shell that the court of appeals' list of circumstantial factors are not evidence that Shell lacked good faith when fixing its DTW price. The DTW price, the captive nature of the franchisee relationship, and the business losses suffered by the Dealers are variations of the same theme: Shell's DTW price is too high for the Dealers to compete with other gasoline retailers. But good faith under section 2.305(b) does not mandate a competitive price for each individual Dealer, nor could it. The competitive circumstances of each Dealer in the same pricing zone may vary from station to station, and yet Shell must treat them all the same.

■ The court of appeals, however, suggests that because the Dealers paid more than most of the other gasoline retailers in Houston, the DTW price itself is some evidence of Shell's subjective bad faith. 102 S.W.3d at 214 ("73–80% of [the Dealers'] Houston competition paid rack price—or lower—for gas. . . ."). We cannot agree that a relatively high, yet commercially reasonable, price is evidence of bad faith. A good-faith price under section 2.305 is not synonymous with a fair market price or the lowest price available. *TCP Indus., Inc. v. Uniroyal, Inc.*, 661 F.2d 542, 548 (6th Cir.1981); *Harvey v. Fearless Farris Wholesale, Inc.*, 589 F.2d 451, 461 (9th Cir.1979); *see also* 1 James J. White & Robert S. Summers, Uniform Commercial Code § 3–8, at 150 (4th ed. 1995) ("Note that the section says 'a reasonable price' and not 'fair market value of the goods.' These two would not be identical.").

■ Each Dealer contractually agreed to buy gasoline at the DTW price applicable only to Shell-branded lessee-dealers. The court of appeals' wholesale cost analysis indiscriminately compares Shell's DTW price to prices available to other classes of trade, with different contractual buying arrangements. Included in the comparison are branded and unbranded jobbers who pick up their gasoline at terminals, open dealers who own their own premises, and company-owned stores operated by other

refiners. Evidence that different prices are available to different classes of trade is not evidence of bad faith under section 2.305. *See Ajir v. Exxon Corp.,* No. C 93–20830, 1995 WL 261412, at *4 (N.D.Cal. May 2, 1995)[4] ("The existence of different prices for different classes of trade is not sufficient to demonstrate that [a refiner] is overcharging plaintiffs for gasoline."), *aff'd,* 185 F.3d 865 (table), 1999 WL 393666 (9th Cir.1999); *Exxon Corp. v. Superior Court of Santa Clara County,* 51 Cal. App.4th 1672, 60 Cal.Rptr.2d 195, 205 (1997) (same).

Moreover, the court's description of the Dealers as " 'captive buyers' required to purchase Shell-branded gas at Shell's price" is not evidence of bad faith or an abnormal case within the meaning of Comment 3. 102 S.W.3d at 214. Dealers are only "captive" as a result of their own choice to become Shell-branded lessee dealers, which involved their agreement to buy gasoline from Shell at the DTW price, rather than at rack or some other price. That is the nature of a long-term franchise. Such "captivity" is therefore the "normal" case.

Because the summary judgment evidence establishes that Shell's posted price was both commercially reasonable and fairly applied to the Dealers, we reverse the judgment of the court of appeals and render judgment that the plaintiffs take nothing.

Justice O'NEILL, Justice SCHNEIDER, and Justice BRISTER did not participate in the decision.

---

4. Under the Ninth Circuit's rules, unpublished opinions may be cited to demonstrate a conflict among opinions. 9th Cir. R. 36–3(b)(iii).