[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
JUNE 26, 2009
THOMAS K. KAHN
CLERK

_____

No. 08-11607

_____

D. C. Docket No. 05-00113-CV-CDL-4

AUTRY PETROLEUM COMPANY,
MCDONALD OIL COMPANY,

Plaintiffs-Appellants,

versus

BP PRODUCTS NORTH AMERICA, INC.,
a Maryland corporation,

Defendant-Appellee.

_____

Appeal from the United States District Court
for the Middle District of Georgia

_____

(June 26, 2009)

Before TJOFLAT and EDMONDSON, Circuit Judges, and RYSKAMP,[*] District
Judge.

_____

[*] Honorable Kenneth L. Ryskamp, United States District Judge for the Southern District
of Florida, sitting by designation.

PER CURIAM:

Plaintiffs-Appellants Autry Petroleum Company and McDonald Oil Company, independent Georgia corporations, brought this diversity action on behalf of themselves and other intermediate distributors ("Jobbers") of products of Defendant-Appellee BP Products of North America, Inc. ("BP"), alleging that BP failed to set in good faith the price it charged Jobbers for BP products. BP moved for -- and was granted -- summary judgment: the district court concluded that Jobbers failed to create a genuine issue of material fact that BP's pricing acts breached the uniform Branded Jobber Contract (the "Contract") between BP and its Jobbers or contravened BP's good faith obligations under the Uniform Commercial Code. We agree and affirm the judgment.

BACKGROUND

BP sells branded and unbranded-fuel products to Jobbers who act as intermediaries in the distribution of BP's products. Pursuant to the Contract, Jobbers are required to purchase a minimum amount of fuel from BP over the three-year term of the Contract. The price under the Contract is an open-price

2

term: the price to be paid is the price posted by BP in effect at the time the Jobber "lifted" gasoline from a BP terminal (the "Jobber Buying Price").[1] Jobbers concede that BP has the exclusive right to determine price under the Contract, that nothing in the Contract controls how the price is to be set by BP, that BP does not discuss -- and has no obligation to discuss -- how it sets the Jobber Buying Price, and that BP makes no effort -- and has no obligation -- to be transparent in its pricing methodology. The Contract includes integration and no-modification clauses.

The Contract is silent about the terms of payment. The parties agree that BP offered the Jobbers a prompt-pay discount of one percent off the Jobber Buying Price for purchases paid by electronic fund transfer ("ETF") within 10-days of lift. BP invoices to the Jobbers referenced the one percent 10-day prompt-pay discount; all Jobbers took advantage of the offered discount. That the price paid by a Jobber making payment within 10 days of lift was one percent less than the posted Jobber

---

[1]The open-price term in the Contract provides:

> [t]he price which Jobber will pay for each Product sold under this contract will be Company's jobber buying price, as recorded at the applicable Company business unit, regional office or such other office as Company may designate from time to time, in effect on the date and at the time of sale from the respective terminals designated by Company.

Buying Price is undisputed .[2]

The Jobbers brought suit complaining that BP inflated its calculation of the Jobber Buying Price by including in that calculation the costs associated with offering the prompt-pay discount. The Jobbers maintain that BP effectively denied them the benefit of the promised prompt-pay discount when it recaptured that discount in the Jobber Buying Price. The Jobbers assert this stealth recapture frustrated their expectations and constituted a breach of BP's duty under the UCC to set the open-price term in good faith.[3]

STANDARD OF REVIEW

We review a district court grant of summary judgment de novo, viewing the evidence and all reasonable inferences in the light most favorable to the nonmoving party. Martin v. Brevard County Public Schools, 543 F.3d 1261, 1265

---

[2]Prompt-pay discounts are common in the petroleum industry. The parties dispute whether the prompt-pay discount term has been integrated into the Contract by course of dealing or course of performance. For summary judgment purposes, the district court assumed integration into the Contract. For purposes of reviewing the grant of summary judgment, we also assume integration.

[3]Whether BP includes the costs associated with the prompt-pay discount in calculating the Jobber Buying Price is disputed. For summary judgment purposes, BP accepts that a material issue of fact exists on this issue; so, for summary judgment purposes, the district court assumed that BP inflated the Jobber Buying Price by some amount to offset the one percent prompt-pay discount. We proceed from the same assumption.

4

(11th Cir. 2008). Summary judgment is due to be affirmed only if no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law. Id.; Fed.R.Civ.P. 56(c). A mere "scintilla" of evidence in favor of the non-movant will not defeat a motion for summary judgment. Anderson v. Liberty Lobby, Inc., 106 S.Ct. 2505, 2512 (1986).

## DISCUSSION

Under the UCC -- applicable to this appeal as adopted by Georgia -- an obligation to perform in good faith is implied into every contract, UCC § 1-203;[4] and a duty to act in good faith when setting an open-price term is imposed expressly by UCC § 2-305(2).

(a) *Breach of UCC § 1-203 implied covenant of good faith*.

UCC § 1-203 provides: "Every contract or duty within this Act imposes an obligation of good faith in its performance or enforcement." But the good faith duty implied under section 1-203 requires proof that a party acted in bad faith on a specific contractual provision; as a matter of law, no claim based on this implied

---

[4]The UCC is in Title 11 of the Official Code of Georgia.

5

term can succeed unless the claim is tied to an express contract term.  See UCC §

1-203 commentary ("This section does not support an independent cause of action

for failure to perform or enforce in good faith.  Rather, this section means that a

failure to perform or enforce, in good faith, a specific duty or obligation under the

contract, constitutes a breach of that contract....").

Interpreting the UCC's implied good faith duty under Georgia law, we have

explained: "the 'covenant' [to perform in good faith] is not an independent contract

term.  It is a doctrine that modifies the meaning of all explicit terms in a contract,

preventing a breach of those explicit terms *de facto* when performance is

maintained *de jure*.  But it is not an undertaking that can be breached apart from

those terms."  Alan's of Atlanta, Inc. v. Minolta Corp., 903 F.2d 1414, 1429 (11th

Cir. 1990 (internal citations omitted); see Stuart Enterprises Intern., Inc. v. Peykan,

Inc., 555 S.E. 2d 881, 884 (Ga.App. 2001) (expressing agreement with Alan's of

Atlanta).

The Contract included no prompt-pay discount; it failed to address terms of

payment.  The Contract did contain provisions for complete integration and

disallowance of modification.  Nonetheless, the district court determined that

genuine issues of material fact existed on whether the one percent prompt-pay

discount term offered by BP and reflected on BP invoices had been integrated into

6

the Contract by the course of dealing or course of performance. See Allapattah Services, Inc. v. Exxon Corp., 333 F.3d 1248, 1261 (11th Cir. 2003) (allowing, under the UCC, extrinsic evidence of "course of dealing" or "usage of trade" or "course of performance" to supplement or explain a written contract containing an integration clause). We, too, for purposes of summary judgment, treat the one percent prompt-pay discount as an operative term of the Contract.

But even accepting that the Contract obligated BP to provide a one percent prompt-pay discount, the record is clear that BP invoices reflected fully the discount off the Jobber Buying Price if EFT payment was made within 10 days. Jobbers who made payment timely (and it seems that Jobbers always did) benefitted from the discount; the discount would have been sacrificed if EFT payment had not made within 10 days. The prompt-pay discount term was not breached.

To the extent Jobbers argue that BP's inclusion of the costs of the discount in its Jobbers Buying Price calculation was in bad faith and, as such, breached the implied duty of good faith, Jobbers's argument is without merit. The Contract imposed no limits on the costs that BP could recoup in setting the Jobbers Buying Price. Jobbers' invitation to this Court to impose fundamental substantive limitations on the pricing methodology set out by the parties in the Contract finds

7

no support in section 2-103's implied obligation of good faith.

(b) *Breach of express covenant of good faith UCC § 2-305.*

The UCC provision governing open-price terms imposes an express

obligation of good faith upon a party to a contract who has the power to fix a price:

"A price to be fixed by the seller or by the buyer means a price for him to fix in

good faith." UCC § 2-305(2). And the commentary presents this explanation:

> Subsection (2), dealing with the situation where the price is to be
> fixed by one party rejects the uncommercial idea that an agreement
> that the seller may fix the price means that he may fix any price he
> may wish by the express qualification that the price so fixed must be
> fixed in good faith. Good faith includes observance of reasonable
> commercial standards of fair dealing in the trade if the party is a
> merchant. (Section 2-103). But in the normal case a "posted price" or
> a future seller's or buyer's "given price," "price in effect," "market
> price," or the like satisfies the good faith requirement.[5]

UCC 2-305 comment 3. UCC section 2-103, referenced in the commentary,

provides "'good faith' in the case of a merchant means honesty in fact and the

observance of reasonable commercial standards of fair dealing in the trade."

The parties agree that the Contract price was an open-price term governed by

UCC section 2-305(2). And no dispute exists that this open-price term was a

---

[5]Georgia courts look to the official comments accompanying a UCC section to determine the legislature's intent in enacting the provision. See <u>Sun v. Mercedes Benz Credit Corp</u>., 562 S.E.2d 714, 717 (Ga.App. 2002).

8

"'posted price' or a future seller's or buyers 'given price,' 'price in effect,' 'market price,' or the like." UCC § 2-305 comment 3. But the parties do dispute whether this is a "normal case" such that the price set by BP enjoys a presumption that the good faith requirement is satisfied.

Although the UCC provides no definition of the "normal case" contemplated by comment 3, we accept that the draftsmen of the UCC intended that the safe harbor created by the normal case good faith presumption apply broadly lest every price set pursuant to an open-price term be vulnerable to attack and subject to litigation. See Walter D. Malcolm, *The Proposed Commercial Code: A Report on Developments from May 1950 through February 1951*, 6 Bus. Law. 113, 185-186 (1950-51). The draftsmen sought to avoid imposing on the open-price-term setter the burden of establishing the reasonableness of the price set; the open-price term provision was crafted to insulate posted prices and the like from reasonableness review provided the price imposed was not discriminatory. See id.; Wayman v. Amoco Oil Co., 923 F.Supp. 1322, 1346-47 (D.Kan. 1996) ("It is abundantly clear ... that the chief concern of the UCC Drafting Committee in adopting § 2-305(2) was to prevent *discriminatory* pricing -- i.e., to prevent suppliers from charging two buyers with identical pricing provisions ... different prices for arbitrary or discriminatory reasons.") (emphasis in original).

9

The parameters of the "normal case" have been subject to much litigation. Purchasers oftentimes have sought -- with some limited success -- to deny safe harbor treatment to non-discriminatory posted pricing where an allegation of subjective bad faith is made. See, e.g., Marcoux v. Shell Oil Products Co. LLC, 524 F.3d 33, 50 (1st Cir. 2008) (states mere allegations of bad faith never sufficient to survive summary judgment, but upholds damage verdict where jury determined that non-discriminatory-posted price was set in bad faith and sufficient evidence supported jury finding that price imposed was commercially unreasonable), cert. granted by, Mac's Shell Service, Inc. v. Shell Oil Products Co. LLC (U.S. June 15, 2009)(No. 08-240) and by Shell Oil Products Co. LLC v. Mac's Shell Service Inc. (U.S. June 15, 2009 (No. 08-372); Mathis v. Exxon Corporation, 302 F.3d 448, 457-58 (5th Cir. 2002) (applying UCC § 2-305 under Texas law, concluded "normal case" good faith presumption applies only when objective (commercial reasonableness) and subjective (honesty in fact) good faith are both satisfied); but see Shell Oil Company v. HRN, Inc., 144 S.W.3d 429 (Texas 2004) (Texas Supreme Court rejects Mathis to the extent that Mathis allowed circumstantial evidence of a lack of subjective good faith -- without more -- to nullify normal case presumption of good faith).

But the majority of courts who have had occasion to consider the "normal

10

case" good faith presumption have applied it where the price charged was within the range of commercially reasonable prices and was applied non-discriminatorily to similarly-situated purchasers. See Shell Oil Company v. HRN, 144 S.W.3d 429, 434 (Texas 2004) (listing cases rejecting subjective approach accepted in Mathis). In HRN, Inc., the Texas Supreme Court concluded that subjective bad faith on the part of the seller -- even subjective bad faith having at its core an intent to force dealers out of business -- was irrelevant to application of UCC section 2-305's safe harbor. The HRN court wrote these words:

> It is not apparent, however, why the intent behind a commercially reasonable, non-discriminatory price should matter for purposes of a breach of contract claim under section 2.305(b)....Premising a breach of contract claim solely on assumed subjective motives injects uncertainty into the law of contracts and undermines one of the UCC's primary goals -- to promote certainty and predictability in commercial transactions.

Id. at 435 (internal quotation and citation omitted). The HRN court noted further that cases that allow a lack of subjective good faith, without more, to create an "abnormal case" gut the safe harbor set out in UCC section 2-305's comment 3; such a "result appears to conflict with the drafters' desire to eliminate litigation over prices that are nondiscriminatory and set in accordance with industry standards." Id. See also, Casserlie v. Shell Oil Co., 902 N.E.2d 1, 5 (Ohio 2009) ("If a subjective inquiry could determine bad faith, a seller charging a fair price,

11

even exactly the same price as another, good-faith seller, could be deemed to be acting in bad faith."). Subjective good faith analysis takes away the force of the presumption of good faith and is incompatible with the notion of a safe harbor.

The case upon which Jobbers rely most heavily is Allapattah Services, Inc. v. Exxon Corporation, 61 F.Supp. 2d 1308 (S.D. Fla. 1999) (Allapattah I). Allapattah I denied Exxon summary judgment in a suit brought by its dealers in which an open-price term in a supply contract was at issue. The supply contract granted Exxon the unilateral right to set pricing; the contract contained no express limitation on Exxon's methodology. Exxon wanted to encourage its dealers to offer purchasers a discount for cash to enable the dealers to be more competitive with sellers of unbranded gasoline sold on a cash only basis. To this end, Exxon told its dealers it would impose a three percent processing fee on all credit card transactions and also made an express representation that it would reduce the open-term contract price charged by an amount that -- on average -- would offset the three percent credit card processing fee. While Exxon apparently kept this promise for six months, the dealers alleged that unknown to them -- and in violation of Exxon's express promise -- Exxon stopped providing the promised offset: the dealers were double-charged for costs associated with credit card processing. And, according to the dealers, in addition to failing to honor its pricing promise, Exxon's

12

pricing strategy was used secretly as part of an attempt to drive "non-keeper" dealers out of business.

The district court in Allapattah I stressed that the dealers alleged both double charging and an intent to drive some dealers out of business; it concluded that the dealers had offered sufficient evidence in support of these allegations to raise a triable jury issue. Id. at 1322. The district court denied Exxon the presumption of good faith applicable to a normal case: the dispute was not over the actual amount of the price Exxon charged for its wholesale gasoline to its dealers, but over the manner in which the wholesale price was calculated. Sufficient evidence was proffered that Exxon's discount for cash program double-charged the dealers for the cost of credit card processing, that Exxon concealed this systematic and intentional overcharge from the dealers, and that the overcharges were implemented by Exxon with the intent of driving some of its dealers out of business. In the light of this evidence, Exxon was denied the safe harbor otherwise available in a normal case.[6]

_____

[6]The Allapattah I denial of summary judgment was not subject to appeal, but we had occasion in Allapattah Services, Inc. v. Exxon Corp., 333 F.3d 1248 (11th Cir. 2003), to consider a number of orders of the district court. While those post-trial orders related chiefly to class certification, claims processing, and damages as well as some evidentiary issues, the underlying breach of contract claim was also reviewed. Allapattah rejected Exxon's argument that no reasonable jury could have found that Exxon breached its obligations under the dealer agreements, id. at 1256 n.8; the opinion also concluded that the evidence presented at trial was sufficient to support the jury's finding that Exxon fraudulently concealed that breach, id. at 1263. And, in a footnote, Allapattah referenced the parties' competing arguments on good faith:

13

The case before us is different. In the instant case, the district court expressly avoided making a decision about whether the "normal case" presumption applied; it concluded that BP was entitled to summary judgment without the benefit of the "normal case" presumption: the Jobbers produced insufficient evidence that BP breached its good faith obligations in setting the open-price term. We agree that summary judgment was due to be granted.

But we conclude that the normal case safe harbor applies in this case; Allapattah I is readily distinguishable.[7] Allapattah I involved stealth double-charging in violation of express promises made and allegations (which had record support) that Exxon was attempting to drive some dealers out of business. The latter factor appears to have been critical to the Allapattah appellate court's statement that a factual issue for the jury had been raised on Exxon's good faith.

---

> Exxon argues that because the dealers were charged Exxon's price in effect at the time of fuel deliveries, it satisfied the good faith requirement. The dealers alleged, however, that this case was not a normal case, because Exxon was attempting to drive some of the dealers out of business, and, therefore, Exxon did not satisfy the good faith requirement. We agree with the district court that whether this case constituted a normal case was a factual issue necessary to determine whether Exxon acted in good faith. It therefore was a question for the jury.

Id. at 1262 n. 16.

[7]We do not intend our discussion of the Allapattah cases to suggest we accept Jobbers' reading of the district or appellate court decisions. We say only that the facts underlying the present appeal are different materially from those underlying the Allapattah decisions.

14

In the instant case, the Jobbers allege no double-charging; and no allegation has been made of an intent to drive dealers out of business.

Jobbers contend that it is the manner in which BP set its price (not the price itself) that is the gravamen of their claim, but Jobbers' challenge to the pricing "manner" includes no claims that BP set the price too high compared to prices charged to others, that the prices were discriminatory, that the prices were outside the range of other oil companies, or that the pricing strategy was designed to drive dealers out of business. The "manner" in which the price is set -- at issue in Allapattah -- was at issue only because Exxon made specific, express promises about the way it would adjust its prices and because Exxon sought to use pricing to weed out unwanted dealers. In contrast, the only bad act the Jobbers allege is BP's purported recapture of the cost of the prompt-pay discount when setting its price. And while the Jobbers seek to cast this recapture as commercially unreasonable, this claimed commercial unreasonableness is based solely on the Jobbers' subjective beliefs; it is linked to no objective commercial reality.[8] The good-faith

---

[8]Jobbers claim BP's act of recouping the costs of the discount in the Jobber Contract Price without their knowledge was commercially unreasonable and contrary to their expectations. But the evidence upon which Jobbers rely was limited to subjective testimony of Jobbers' witnesses that they expected -- without any promise of BP -- that the discount was not to be recouped. Jobbers did proffer deposition testimony of one BP employee (not knowledgeable about pricing methodology and uninvolved in pricing decisions) that he might consider it unfair if BP recouped the prompt-pay discount. But this subjective stray conclusion and Jobbers' subjective expectations -- unrelated to a representation or other act of BP -- raise no triable issue of commercial reasonableness.

15

safe harbor provided in UCC § 2-305(2) would be undermined -- and the certainty

a safe harbor provides would be frustrated -- if, without more, an allegation of

subjective bad faith trumped the normal case presumption of good faith.

AFFIRMED.