EXXON MOBIL CORP., Petitioner,

v.

Dan GILL, et al., Respondents.

No. 07–0404.

Supreme Court of Texas.

Nov. 20, 2009.

Rehearing Denied Jan. 15, 2010.

David M. Gunn, Russell S. Post, John Sidney Adcock, Beck, Redden & Secrest, L.L.P., Houston TX, Richard C. Godfrey, Mark S. Lillie Andrew A. Kassof, Kirkland & Ellis LLP, Chicago IL, J.A. (Tony) Canales, Canales & Simonson, P.C., Corpus Christi TX, for Petitioner.

David T. Bright, Watts Law Firm, L.L.P., Corpus Christi TX, James P. Roy, Bob F. Wright, Domengeaux, Wright, Roy & Edwards, Lafayette LA, Walter C. Thompson Jr., James M. White III, Barkley & Thompson, L.C., New Orleans LA, Fredric Levin, Troy Rafferty, Levin Papantonio Thomas Mitchell Echsner & Proctor, Pensacola FL, William Denton, Law Office of William Denton, Biloxi MS, Spencer Hosie, John B. McArthur, James T. McCartt, Hosie Rice LLP, San Francisco CA, William Large, Hoise, Frost, Large & McArthur, Anchorage AK, William Hoese, Kohn, Swift & Graf, P.C., Philadelphia PA, Robert C. Josefsburg, Podhurst Orseck, Miami FL, for Respondents.

David Michael Rodi, Baker & Botts, L.L.P., Houston, for Amicus Curiae.

PER CURIAM.

For several years, Exxon Mobil Corp. offered service station dealers individual rebates based upon a dealer's sales volume and hours of operation. Three Texas dealers, Dan Gill, Howard Granby, and Patrick Morrow ("the Dealers"), sued Exxon in the

county court at law of Nueces County on behalf of all Exxon dealers in the nation, complaining that unbeknownst to them, Exxon added the cost of the rebate programs back into the wholesale price Exxon charged them for gasoline. The Dealers initially moved to certify a nationwide class, but after this Court's decision in *Compaq Computer Corp. v. Lapray*, 135 S.W.3d 657 (Tex.2004), they sought certification of only a statewide class, and plaintiffs' counsel refiled the claims for all other Exxon dealers in the United States in federal court. The federal court rendered summary judgment for Exxon. *Flagler Auto., Inc. v. Exxon Mobil Corp.*, 582 F.Supp.2d 367 (E.D.N.Y.2008). Meanwhile, the Texas trial court certified a class of all Texas dealers, and the court of appeals affirmed. 221 S.W.3d 841 (Tex.App.-Corpus Christi–Edinburg 2007). Because the lower courts did not correctly construe and apply our decision in *Shell Oil Co. v. HRN, Inc.*, 144 S.W.3d 429, 434–436 (Tex. 2004), we reverse and remand the case to the trial court.

 "Courts must perform a rigorous analysis before ruling on class certification to determine whether all prerequisites to certification have been met." *Sw. Ref. Co. v. Bernal*, 22 S.W.3d 425, 435 (Tex.2000) (citation and internal quotation marks omitted). In so doing, courts "may look beyond the pleadings." *Intratex Gas Co. v. Beeson*, 22 S.W.3d 398, 404 (Tex.2000). "Because class determinations generally involve considerations that are enmeshed in the factual and legal issues comprising the plaintiff's cause of action, the trial court must be able to make a reasoned determination of the certification issues." *Id.* (citation and internal quotation marks omitted). And while "[d]eciding the merits of the suit in order to determine ... its maintainability as a class action is not appropriate," *Beeson*, 22 S.W.3d at 404 (cita-

tions omitted), "the substantive law ... must be taken into consideration in determining whether the purported class can meet the certification prerequisites under [Texas Rule of Civil Procedure] 42," *Union Pac. Res. Group, Inc. v. Hankins*, 111 S.W.3d 69, 72–73 (Tex.2003).

The parties do not dispute that each dealer's sales agreement with Exxon contained essentially the same open-price provision, obligating the dealer to pay Exxon its "established" price or price "in effect" at the time of the loading of the delivery vehicle (referred to as the DTW or DTT price, short for dealer tank wagon or dealer tank truck). Such provisions are permitted by section 2.305 of the Uniform Commercial Code, in Texas, Tex. Bus. & Com.Code § 2.305, which states in pertinent part:

(a) The parties if they so intend can conclude a contract for sale even though the price is not settled. In such a case the price is a reasonable price at the time for delivery....

(b) A price to be fixed by the seller or by the buyer means a price for him to fix in good faith.

Comment 3 creates a safe harbor within (b), advising that "in the normal case a 'posted price' or a future seller's or buyer's 'given price,' 'price in effect,' 'market price,' or the like satisfies the good faith requirement." Tex. Bus. & Com.Code § 2.305 cmt. 3. *See Romo v. Austin Nat'l Bank*, 615 S.W.2d 168, 171 n. 2 (Tex.1981) ("Although the official comments to the Code were not enacted by the Legislature, they serve as a valuable aid in construing the statutory language." (citations omitted)).

The Dealers do not contend that they were charged anything other than the DTW or DTT price, or that the prices charged were commercially unreasonable in amount or discriminatory. Rather, they

complain that Exxon promised that the rebate programs would provide dealers real economic benefits but recouped the rebates by factoring them back into prices without disclosing what it was doing. Exxon admits that it took rebate costs into account in setting prices but disputes whether the costs were fully recouped and how much dealers knew.

The trial court certified a class asserting three claims: (1) breach of the sales agreements; (2) breach of section 2.305's duty of good faith; and (3) breach of rebate promises. *See* 221 S.W.3d 841, 848. The court of appeals viewed the first two as "the same"—for breach of the open-price provisions, *id.* at 851—but saw the third claim as separate—"for breach of the promise to provide economic benefits under the rebate programs," *id.* at 852. The court of appeals construed all three as claims for breach of contract and rejected Exxon's argument that the Dealers really alleged fraud. *Id.* at 849 ("The claims are … contract claims, not tort claims, as Exxon suggests."); *id.* ("plaintiffs have not asserted a cause of action for fraud"); *id.* at 853 ("this is a contract case"). The Dealers also tell us in their brief that "Exxon is simply wrong when it argues that this breach-of-contract case … is a fraud case."

■■ The Dealers have a compelling reason to confine their claim to breach of contract: generally speaking, to recover for fraud or other misrepresentation, plaintiffs must offer evidence that they relied on the defendant's misconduct. *See Henry Schein, Inc. v. Stromboe*, 102 S.W.3d 675, 686 (Tex.2002). Such evidence is often different for each individual, depending on how and what each was told, what each knew of the matter, and how each reacted, thus precluding the predominance of common issues required to maintain a class action under Rule 42(b)(3).

*See id.* at 693–694. To recover for breach of contract, proof of reliance is not required.

Accepting the Dealers' assertion that theirs is a contract action only, we see no distinction in their claims. They do not allege that Exxon's promises regarding the rebates were a separate contract or modified the sales agreements. They do not assert an independent breach-of-contract action based on any promises made by Exxon. Their complaint that they never received the rebate benefits Exxon promised is simply the basis for their claim that Exxon did not act in good faith and therefore breached the open-price provisions. Thus, we have before us a single claim for breach of the open-price provisions, and the issue is whether the trial court acted properly in certifying it as a class action.

■ As noted above, comment 3 to section 2.305 provides that a seller who charges a "price in effect" or the like, as Exxon did, acts in good faith "in the normal case." TEX. BUS. & COM.CODE § 2.305 cmt. 3. In *Shell Oil Co. v. HRN, Inc.*, 144 S.W.3d 429 (Tex.2004), we explained that "the normal case" is generally one that does not involve discriminatory pricing and that:

Beyond prohibiting discriminatory pricing, the [UCC] drafters wished to minimize judicial intrusion into the setting of prices under open-price-term contracts. They understood that requiring sellers in open-price industries, such as the oil and gas industry, to justify the reasonableness [of] their prices in order to satisfy section 2.305 would mean that in every case the seller is going to be in a lawsuit and that every sales contract would become a public utility rate case. The drafters reasonably foresaw that almost any price could be attacked unless it benefitted from a strong presumption. Thus, they adopted a safe harbor, Com-

ment 3's posted price presumption, to preserve the practice of using sellers' standard prices while seeking to avoid discriminatory prices.

*Id.* at 435 (citation and internal quotation marks omitted). To avoid having "a jury . . . determine in every section 2.305(b) case whether there was any improper motive animating the price-setter, even if the prices ultimately charged were undisputedly within the range of those charged throughout the industry," we concluded that the required good faith must be measured objectively, with reference to commercial realities, rather than subjectively, based on the person's motives or alleged dishonesty. *Id.* at 435–436 (citation and internal quotation marks omitted).

*HRN* involved allegations by service station dealers that Shell Oil Co. had violated its open-price contracts, like those involved in the present case, by dishonestly setting prices so high that dealers could not remain competitive in the market, thereby forcing them out of business to be replaced by company-owned stations more profitable to Shell. *Id.* at 432. But the dealers did not claim that the prices charged were commercially unreasonable or discriminatory. Their struggles to compete effectively did not make the case "abnormal" for purposes of comment 3's safe harbor. *Id.* at 437–438.

The trial court in the present case acknowledged that under *HRN*, "a party merely challenging the commercial reasonableness of an open-price without other factors must show price discrimination," but it distinguished *HRN* because of the Dealers' "specific claims of dishonesty in fact based on Exxon's promise of a rebate and acts allegedly taken to remove the benefit promised." We do not see the distinction. The dealers' claims of dishonesty in *HRN*—that Shell was setting prices to drive them out of business—were just as specific, and certainly as reprehen-

sible, as those asserted by the Dealers in the present case. Here, as in *HRN*, there is no claim that the open prices charged were commercially unreasonable in amount or discriminatory. The Dealers here point to nothing in the contracts that prohibited Exxon from taking rebate costs into account in setting prices.

The court of appeals distinguished *HRN* because this case involves "specific promises of economic remuneration for keeping stores open specified hours and selling specified volumes of gasoline." 221 S.W.3d at 852. But as we have already noted, the Dealers do not assert a cause of action for breach of such promises. They disavow any claim of fraud, and they do not assert that any promises Exxon made to them constituted a contract or modified their sales agreements. The Dealers' only claim is for breach of the open-price provisions, and the question is whether Exxon's alleged failure to disclose that it was setting prices to recoup rebate costs may violate section 2.305's good faith requirement when Shell's alleged practice of setting prices to drive dealers out of business did not. The answer is no.

Thus, it appears that the Dealers' claim lacks merit. As noted at the outset, a federal district court has already reached this very conclusion in an identical case on behalf of all Exxon dealers in the United States outside Texas. *Flagler Auto., Inc. v. Exxon Mobil Corp.*, 582 F.Supp.2d 367 (E.D.N.Y.2008). The federal Eleventh Circuit has held the same in a similar case involving a different oil company and rebate, *Autry Petroleum Co. v. BP Prods. N. Am., Inc.*, 334 Fed.Appx. 982 (11th Cir. 2009) (per curiam). In *Autry*, as here, dealers complained that the oil company had factored the cost of a rebate program back into the prices charged. Citing *HRN*, the court in *Autry* concluded: "The good-faith safe harbor provided in UCC [§ 2–305(2) ] would be undermined—and

the certainty a safe harbor provides would be frustrated—if, without more, an allegation of subjective bad faith trumped the normal case presumption of good faith." *Id.* at 988.

The Dealers point to an earlier Eleventh Circuit case, *Allapattah Services, Inc. v. Exxon Corp.*, 333 F.3d 1248 (11th Cir. 2003), yet another case involving claims by service station dealers that an oil company breached "open price" provisions. In that case, the company promised to discount its pricing to offset credit transaction charges but later withdrew the offset without notice. The court approved class action treatment. But *Allapattah* was different, the court later explained in *Autry*, because there, "Exxon made specific, express promises about the way it would adjust its prices," agreeing that rebate costs would not be added back in. *Autry*, at 988. The Dealers in this case make no such allegation. To the contrary, they allege that Exxon factored rebate costs into prices "secretly," without disclosing what it was doing.

■ The trial court and court of appeals misconstrued our decision in *HRN* and misapplied it to this case. When a class has been certified based on a significant misunderstanding of the law, we have concluded that "remand to the trial court is appropriate so that it may determine the effect ... on the requirements for class certification." *BMG Direct Mktg., Inc. v. Peake*, 178 S.W.3d 763, 778 (Tex.2005). Accordingly, the trial court's class certification order is vacated and the case is remanded to that court for further proceedings.

Justice O'NEILL and Justice GUZMAN did not participate in the decision.