[Cite as *Rhodes v. Paragon Molding, Ltd.,*, 2011-Ohio-4295.]

IN THE COURT OF APPEALS FOR MONTGOMERY COUNTY, OHIO

ROY RHODES, et al.                          :

    Plaintiffs-Appellants          :          C.A. CASE NO.    24491

v.                                          :          T.C. NO.    06CV1427

PARAGON MOLDING, LTD., et al.    :          (Civil appeal from
                                      Common Pleas Court)
    Defendants-Appellees          :

                                     :

. . . . . . . . . .

**O P I N I O N**

Rendered on the ___26th___ day of ___August___, 2011.

. . . . . . . . . .

RONALD J. KOZAR, Atty. Reg. No. 0041903, Kettering Tower, Suite 2830, 40 N. Main Street, Dayton, Ohio 45423
    Attorney for Plaintiffs-Appellants

ROBERT J. SURDYK, Atty. Reg. No. 0006205 and KEVIN A. LANTZ, Atty. Reg. No. 0063822, 1 Prestige Place, Suite 700, Miamisburg, Ohio 45342
    Attorneys for Defendants-Appellees

. . . . . . . . . .

DONOVAN, J.

{¶ 1} Plaintiff-appellant Roy Rhodes appeals from a decision of the Montgomery County Court of Common, General Division, sustaining in part and overruling in part a motion for summary judgment filed by defendant-appellees Paragon Molding, Ltd. Plaintiff-appellant filed his timely notice of appeal on February 16, 2011.

I

{¶ 2} Plaintiffs Roy and Jimmie Rhodes were the member-owners of a limited liability company called Huntin' Buddy Industries (hereinafter "Huntin' Buddy"). Huntin' Buddy manufactured and sold turkey and duck calls designed by Roy Rhodes. When Jimmie Rhodes decided to retire from the hunting call business, the Rhodeses put Huntin' Buddy's assets up for sale. In September 2004, Huntin' Buddy was purchased by Paragon. Paragon is a limited liability company owned by Jim and Vicki Miller, with its principal place of business in West Milton, Ohio.

{¶ 3} Paragon and the Rhodeses entered into two separate agreements in relation to Huntin' Buddy's assets and Roy Rhodes' employment with Paragon. The assets were purchased pursuant to the "Contract for Purchase of Corporate Assets" (hereinafter "purchase contract"). The purchase price for the assets was $250,000. According to paragraph 6 of the purchase contract, Paragon was to pay $200,000 at the time of closing, with $50,000 due at a later time. Roy Rhodes was to maintain a 35% value in the "Roy Rhodes Championship Call division" (hereinafter "RRCC") of the Paragon company. If RRCC was sold, Roy Rhodes would have been entitled to 35% of the net purchase price of that division. If Paragon, the parent company, was sold, Roy Rhodes would only have been entitled to 35% of the net value of RRCC. In addition, Roy Rhodes would have been entitled to 35% of any distributed profits after taxes. Furthermore, paragraph 6 of the purchase contract states that RRCC would be a division separate from Paragon.

{¶ 4} Paragon and Roy Rhodes also signed an "Employment and Relationship Agreement" (hereinafter "Employment Agreement") whereby Rhodes became employed by

Paragon as the VP of Marketing and R & D. Paragon, however, was still managed solely by the Millers. The Employment Agreement, signed on September 25, 2004, was to run for five years, beginning October 1, 2004. Rhodes was to be paid an annual salary of $44,000, and was to receive full benefits and two weeks of paid vacation each year. Rhodes was also guaranteed 5% sales commission for bringing in any new molding business to Paragon. In addition, if Paragon secured any endorsements for Rhodes, Paragon was to receive 20% commission for those endorsements.

{¶ 5} On December 9, 2005, Paragon terminated Rhodes. In February 2006, Rhodes filed several claims against Paragon pursuant to his termination: breach of the employment contract, unpaid salary, breach of fiduciary duty, wrongful discharge, conversion, and claims relative to a promissory note. On November 13, 2008, Paragon filed a motion for summary judgment on Rhodes' retaliation claims, the breach of fiduciary duty claim, and the claims relative to the promissory note. On December 15, 2008 Rhodes filed his response to that motion, and Paragon filed a reply on January 5, 2009. On February 6, 2009 the trial court granted the motion for summary judgment in favor of Paragon on the claims for retaliatory discharge and the breach of fiduciary duty, as well as, all the claims relative to Jim and Vicki Miller as individual defendants. However, Paragon's claims as to the promissory note were overruled.

{¶ 6} All other claims that were not decided on summary judgment proceeded to a jury trial, which resulted in a verdict for Rhodes on February 13, 2009, with a judgment awarded in the amount of $258,125.00  Following the trial, Rhodes filed a notice of appeal. The only issue before this court on appeal is the trial court's finding in the summary

judgment decision that the defendants owed no fiduciary duty to Rhodes.

II

{¶ 7} Rhodes' sole assignment of error is as follows:

{¶ 8} "THE TRIAL COURT'S ENTRY OF SUMMARY JUDGMENT IN FAVOR OF DEFENDANTS JAMES AND VICKI MILLER ON PLAINTIFF ROY RHODES' CLAIM FOR BREACH OF FIDUCIARY DUTY WAS ERROR."

{¶ 9} In his sole assignment, Rhodes contends that the trial court erred when it sustained Paragon's motion for summary judgment regarding his claim that Jim and Vicki Miller breached their fiduciary duties to him since he was a thirty-five percent co-owner of RRCC. Specifically, Rhodes asserts that a genuine issue of material fact exists as to whether a partnership was formed between he and the Millers when Paragon purchased Rhodes' hunting business and gave him an ownership interest in the newly formed company such that a fiduciary relationship existed which required Paragon to act in the best interests of Rhodes regarding the management of RRCC.

{¶ 10} In its merit brief, Paragon argues that no partnership was ever formed with Rhodes. While it is undisputed that Rhodes was given a thirty-five percent ownership interest, Paragon argues that RRCC was merely a division of the larger company, and that Rhodes was only an employee of RRCC to which no fiduciary duty was owed. Paragon also asserts that Jim and Vicki Miller cannot be held personally liable to Rhodes in their capacity as principals and managers at Paragon.

{¶ 11} An appellate court reviews an award of summary judgment de novo. *Grafton v. Ohio Edison Co.* (1996), 77 Ohio St.3d 102, 105. We apply the same standard as the trial

court, viewing the facts in the case in a light most favorable to the non-moving party and resolving any doubt in favor of the non-moving party. *Viock v. Stowe-Woodward Co.* (1983), 13 Ohio App.3d 7, 12.

{¶ 12} Pursuant to Civil Rule 56(C), summary judgment is proper if:

{¶ 13} "(1) No genuine issue as to any material fact remains to be litigated; (2) the moving party is entitled to judgment as a matter of law; and (3) it appears from the evidence that reasonable minds can come to but one conclusion, and viewing such evidence most strongly in favor of the party against whom the motion for summary judgment is made, that conclusion is adverse to that party." *Temple v. Wean United, Inc.* (1977), 50 Ohio St.2d 317, 327. To prevail on a motion for summary judgment, the party moving for summary judgment must be able to point to evidentiary materials that show that there is no genuine issue as to any material fact, and that the moving party is entitled to judgment as a matter of law. *Dresher v. Burt* (1996), 75 Ohio St.3d 280, 293. The non-moving party must then present evidence that some issue of material fact remains for the trial court to resolve. Id.

{¶ 14} Because "every business relationship is unique, no single fact or circumstance can operate as a conclusive test for the existence of a partnership." *In re Estate of Nuss* (1994), 97 Ohio App.3d 191, 195. Partnership contracts also need not be in writing, but may " 'be proven by showing acts and conduct of the parties from which the fact may be inferred that the parties have agreed to become partners.' " *Brewster v. Bigham*, Lake App. No. 2004-L-113, 2005 -Ohio- 6071, at ¶ 16 (citation omitted).

{¶ 15} A partnership exists where there is "(1) an express or implied contract between the parties; (2) the sharing of profits and losses; (3) mutuality of agency; (4)

mutuality of control; (5) co-ownership of the business and of the property used for partnership purposes or acquired with partnership funds." *Grendell v. Ohio EPA* (2001), 146 Ohio App.3d 1, 13. In the absence of a written partnership agreement, an implied partnership can be found from the totality of attendant facts and circumstances. *Madden Investment Co. v. Stephenson's Apparel*, 162 Ohio App.3d 51, 53, 2005-Ohio-3336.

{¶ 16} A fiduciary duty is generally defined as " ' [a] duty of utmost good faith, trust, confidence, and candor owed by a fiduciary * * * to the beneficiary * * *; a duty to act with the highest degree of honesty and loyalty toward another person and in the best interests of the other person.' " *In re Trust of Bernard*, Summit App. No. 24025, 2008-Ohio-4338, at ¶ 20, quoting from Black's Law Dictionary (8 Ed.Rev.2004) 545. For example, "[p]artners in Ohio owe a fiduciary duty to one another." *Dunn v. Zimmerman*, 69 Ohio St.3d 304, 306, 1994-Ohio-351. We note that the law governing partnerships closely resembles that of close corporations. *Schafer v. RMS Realty*, 138 Ohio App.3d 244, 273; citing *Crosby v. Beam* (1989), 47 Ohio St.3d 105, 108. Controlling shareholders in close corporations owe fiduciary duties to minority shareholders.

{¶ 17} In *Busch v. Premier Integrated Med. Assoc., Ltd.*, Montgomery App. No. 19364, 2003-Ohio-4709, we stated that "like partners, controlling shareholders of a close corporation owe a fiduciary duty to minority shareholders, a duty which is violated when the majority takes action it is authorized to take which nevertheless operates to the disadvantage of the minority and was not undertaken in good faith and for a legitimate business purpose." Id. at ¶ 79, citing *Schafer v. RMS Realty* (2000), 138 Ohio App.3d 144.

{¶ 18} Good faith is "defined generally as 'honesty in fact in the conduct or

transaction concerned.' " *Casserlie v. Shell Oil Co.*, 121 Ohio St.3d 55, 57, 2009-Ohio-3, at ¶ 10, quoting from R.C. 1301.01(S). The Supreme Court of Ohio has also defined the term as follows:

{¶ 19} " 'A lack of good faith is the equivalent of bad faith, and bad faith, although not susceptible of concrete definition, embraces more than bad judgment or negligence. It imports a dishonest purpose, moral obliquity, conscious wrongdoing, breach of a known duty through some ulterior motive or ill will partaking of the nature of fraud. It also embraces actual intent to mislead or deceive another.' " *Hoskins v. Aetna Life Ins. Co.*, 6 Ohio St.3d 272, 276 (citation omitted).

{¶ 20} It is undisputed that the parties did not enter into an express partnership agreement regarding the ownership and management of RRCC. The purchase contract containing the terms of the sale of RRCC, however, states in pertinent part:

{¶ 21} "6. **Purchase Price:** The purchase price is $250,000. ***

{¶ 22} "**c.** Roy Rhodes will maintain 35% of the value of the Roy Rhodes Championship Call division only of Paragon Molding Limited.

{¶ 23} "**d.** Should [RRCC] be sold, Roy Rhodes will be entitled to 35% of the net purchase price related to the [RRCC] division.

{¶ 24} "**e.** Should Paragon Molding Limited be sold as an entirety including [RRCC], Roy Rhodes will be entitled to 35% of the net value of the [RRCC] division only.

{¶ 25} "**f.** Should any profits be distributed from the [RRCC] division of Paragon Molding Limited, Roy Rhodes will be entitled to 35% of said profits after taxes."

{¶ 26} Based on its interpretation of "Paragraph 6" of the purchase contract, the trial

court held that no fiduciary duty was owed to Rhodes by Paragon because "there [was] no ownership in a classic stock or partnership sense." The trial court further held that 35% interest contemplated by the purchase contract was merely "designed to incentivize [sic] [Rhodes] to enhance the value of the acquired assets, this in connection with his continued employment, rather than an ownership interest in the company."

{¶ 27} Construction of written contracts is "a matter of law that we review de novo. * * * Our primary role is to ascertain and give effect to the intent of the parties. * * * We presume that the intent of the parties to a contract is within the language used in the written instrument. * * * If we are able to determine the intent of the parties from the plain language of the agreement, then there is no need to interpret the contract." *Saunders v. Mortensen*, 101 Ohio St.3d 86, 88, 2004-Ohio-24, at ¶ 9 (citations omitted). Accord, *Courtyards of Crystal Lake Homeowners Assn. v. Bradesca*, Cuyahoga App. No. 90966, 2008-Ohio-6157, at ¶ 24.

{¶ 28} Upon review, we conclude that the trial court's interpretation of the purchase contract ignores the plain language in the document which affirmatively states that Rhodes "will maintain 35% of the value" of RRCC. "Maintain" is variously defined as "bear the expense of; carry on; commence; continue; furnish means for subsistence or existence of; hold; keep in an existing state or condition; keep in existence or continuance ***." Black's Law Dictionary (5 Ed.1979) 859. In the context of the purchase contract, the only plausible interpretation of "maintain" is that the parties intended that Rhodes retain ownership of thirty-five percent of RRCC after Paragon purchased the company. This interpretation is supported by the clause in the purchase contract which states that Rhodes is entitled to

thirty-five percent  of any profits distributed by RRCC.   While the purchase contract does not affirmatively state that Rhodes owns thirty-five percent of RRCC, the document essentially makes Rhodes a minority shareholder in RRCC, with the majority shareholder being Paragon.   While we agree with the trial court that the thirty-five percent interest was designed to entice Rhodes to sell RRCC to Paragon, the practical effect of the offer was to provide Rhodes with a minority ownership interest in RRCC.

{¶ 29} This interpretation is further supported by the following deposition testimony provided by one of the owners of Paragon, Jim Miller:

{¶ 30} "Plaintiff's Counsel: *** And isn't it also true that you also gave [Rhodes] a thirty-five percent interest in the [RRCC] division?

{¶ 31} "Jim Miller: That is true also." (Trans. p. 189, lines 13-17)

{¶ 32} ***

{¶ 33} "Q: Well, we talked before about how a thirty-five percent interest was reserved to [Rhodes], right?

{¶ 34} "A: Uh-huh.

{¶ 35} "Q: Is that a yes?

{¶ 36} "A: Yes.

{¶ 37} "Q: *And so someone other than Paragon Molding owned thirty-five percent of Roy Rhodes Championship Calls business*?

{¶ 38} "Defense Counsel: Objection.   Calls for a legal conclusion.   But go ahead.

{¶ 39} "Jim Miller: *Yes*."

{¶ 40} As the excerpt clearly establishes, even the owner of Paragon intended for

Rhodes to retain a thirty-five percent ownership interest in RRCC. Accordingly, this evidence supports a conclusion that an implied partnership existed between Rhodes and Paragon such that Rhodes was entitled to ownership of thirty-five percent of the company itself, thirty-five percent of any profit distribution instituted by the company, and thirty-five percent of the net profits generated during the sale of the company. It, therefore, follows that a genuine issue exists regarding whether Paragon owed a fiduciary duty to Rhodes, who was, ostensibly, a minority owner of RRCC.

{¶ 41} The trial court also held that, assuming a fiduciary relationship, Rhodes failed to establish that breach of that relationship had occurred. Upon review, ample evidence exists in the record which creates a genuine issue regarding whether Paragon engaged in conduct which breached its fiduciary duty to Rhodes. Specifically, Rhodes points out that Jim Miller admitted in his deposition that he essentially stripped Rhodes of his thirty-five percent ownership interest in RRCC when he terminated his employment. Additionally, Rhodes argues that he was excluded by Paragon from any involvement in or information regarding his thirty-five percent interest in the company. These allegations are sufficient to create a genuine issue with respect to whether Paragon breached its fiduciary duty to Rhodes. Thus, the trial court erred when it sustained Paragon's motion for summary judgment with respect to Rhodes' claim for breach of fiduciary duty.

{¶ 42} Lastly, the trial court held that the individual defendants, Jim and Vicki Miller, could not be found personally liable for the actions of Paragon, the company which they managed and directed. A corporation is a separate legal entity from its shareholders even where there is only one shareholder in the corporation. *Zimmerman v. Eagle Mtge.*

*Corp.* (May 3, 1996), 110 Ohio App.3d 762, 771. Therefore, shareholders, officers, and directors will generally not be held personally liable for the acts of a corporation. *Charvat v. Farmers Ins. Columbus, Inc.*, 178 Ohio App.3d 118, 133, 2008-Ohio-4353. In *Belvedere Condominium Unit Owners' Assn. v. R.E. Roark Cos., Inc* (1993), 67 Ohio St.3d 274, the Ohio Supreme Court recognized a limited exception to that rule, holding that the corporate veil could be pierced to allow creditors to personally reach shareholders who had used the corporation for criminal or fraudulent purposes. Specifically, the *Belvedere* court held that the corporate form may be disregarded and individual shareholders held liable for wrongs committed by the corporation when (1) control over the corporation by those to be held liable was so complete that the corporation had no separate mind, will, or existence of its own; (2) control over the corporation by those to be held liable was exercised in such a manner as to commit fraud or an illegal act against the person seeking to disregard the corporate entity; and (3) injury or unjust loss resulted to the plaintiff from such control and wrong.

{¶ 43} Ohio courts have recognized that there is no precise test to determine whether the elements required to pierce the corporate veil have been satisfied, and each case should be "regarded as 'sui generis' and decidable on its own facts." *RCO Internatl. Corp. v. Clevenger*, 180 Ohio App.3d 211, 214, 2008-Ohio-6823; quoting *Bucyrus-Erie Co. v. Gen. Prods. Corp.* (C.A.6, 1981), 643 F.2d 413, 418. Because "[o]ne of the purposes of incorporation is to limit the liability of the individual shareholders," the party seeking to have the corporate form disregarded bears the burden of proof. *Univ. Circle Research Ctr. Corp. v. Galbreath Co.* (1995), 106 Ohio App.3d 835, 840, citing Section 3, Article XIII of

the Ohio Constitution.

{¶ 44} Most recently, however, in *Dombroski v. WellPoint, Inc.*, 119 Ohio St.3d 506, 2008-Ohio-4827, the Ohio Supreme Court held that control of a corporation must have been exercised to commit fraud or an otherwise illegal act, and not merely an unjust act or act committed in bad faith, in order to permit piercing of the corporate veil. In the instant case, Rhodes does not argue nor has he presented any evidence which establishes that Jim Miller or Vicki Miller committed fraud or an illegal act. Rhodes simply asserts that the Millers, as the owners and principal officers of Paragon, "stripped" him of any value or benefit associated with his thirty-five percent interest in RRCC. Thus, Rhodes has failed to meet his burden of proof in order to disregard the corporate form and pursue the Millers in their individual capacities. Accordingly, the trial court did not err when it held that Rhodes was precluded from taking such an action.

{¶ 45} Rhodes' sole assignment of error is sustained in part and overruled in part.

III

{¶ 46} Rhodes' sole assignment of error having been sustained in part and overruled in part, the judgment of the trial court is reversed in part, affirmed in part, and the matter is remanded to the trial court for proceedings consistent with this opinion.

. . . . . . . . . .

FAIN, J. and VUKOVICH, J., concur.

(Hon. Joseph J. Vukovich, Seventh District Court of Appeals, sitting by assignment of the Chief Justice of the Supreme Court of Ohio).

Copies mailed to:

Ronald J. Kozar

Robert J. Surdyk
Kevin A. Lantz
Hon. Gregory F. Singer